**LITTLE, BROWN AND COMPANY, (INC.), Plaintiff,**

v.

**Peter G. BOURNE, Defendant.**

**Civ. A. No. 79–2597–G.**

United States District Court,
D. Massachusetts.

July 23, 1980.

John Taylor Williams, Barbara B. Williams, Haussermann, Davison & Shattuck, Boston, Mass., for plaintiff.

David J. Hatem, Parker, Coulter, Daley & White, Boston, Mass., Edward Ashworth, Charles Morgan Jr. & Assoc., Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

GARRITY, District Judge.

Plaintiff, Little, Brown and Company, a Massachusetts based publishing company, maintains this action to recover $18,500 advanced to the defendant, Peter G. Bourne, on a contract to write a book about Jimmy Carter's 1976 presidential campaign. Dr. Bourne, a resident of the District of Columbia, moved to dismiss for lack of personal jurisdiction or, if unsuccessful on that motion, to transfer the action to the District Court for the District of Columbia pursuant to 28 U.S.C. § 1404(a). We received supporting and opposing memoranda on these issues and heard oral argument. For reasons hereinafter stated both motions are denied.

### Jurisdiction over the Person

Plaintiff's asserted basis for jurisdiction is the Massachusetts long arm statute, Mass. G.L. c. 223A, § 3, and specifically sections 3(a) and 3(b) of the statute. They read as follows:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth; (b) contracting to supply services or things in this commonwealth; . . .

The plaintiff has the burden of proving the court's jurisdiction. *Lizotte v. Canadian Johns Manville Co.*, 1 Cir. 1970, 387 F.2d 607, 608. Here, the question of personal jurisdiction turns on the nature and the extent of defendant's contacts with the Commonwealth during the course of his relationship with the plaintiff publisher. The following facts appear in affidavits filed by the parties.

In March, 1976, the defendant met in Boston with a Little, Brown editor to discuss the prospects for a book about Dr. Bourne's experiences on the Carter presidential campaign. Carter's political fortunes were at that point still unknown and the Bourne book had not advanced much beyond the planning stages. No contract resulted from this first meeting in Boston.

Later in the spring of 1976, the defendant retained the Sterling Lord Agency of New York to act as literary agent on the book. Thereafter, a proposal and outline were put out generally for bids, and in July, 1976, plaintiff received the five page proposal from the New York agent's office. Plaintiff bid on the book, the bid was accepted by the defendant, and on July 27, 1976 a contract was sent by plaintiff in Boston to the New York offices of Sterling Lord. Sterling Lord passed the contract on to the defendant in Washington who signed the contract and returned it to Boston through his agent. The contract called for an advance of $18,500 on signing, which amount plaintiff mailed to Sterling Lord on August 17, 1976.

There then followed an exchange of letters, outlines, and further proposals between the defendant in Washington, D.C., and Roger Donald, a Boston based editor at Little, Brown. In order to meet a spring 1977 deadline for listing the book as a new

release, the parties began an accelerated process of editing by which defendant was to submit each chapter for editing as it was completed. The defendant mailed each installment directly to Little, Brown in Boston. Copies of the manuscript were there circulated to an editor, copy editor, and legal advisor; an initial edit followed, and the edited chapter was then returned to Dr. Bourne for review. As part of this process, plaintiff's editors spoke regularly by phone and corresponded with the defendant to discuss editorial changes, the progress of pending chapters, and the mechanics of delivering the manuscripts by the fastest method possible. At one point the defendant used plaintiff's courier service in Washington, D.C., to avoid the delay of regular mail service. By January or February of 1977, plaintiff had received six chapters of the book (roughly one-half of the total manuscript), and of these had edited five and typeset three in galley form.

With the spring deadline approaching and the book only half complete, the editor in charge, Mr. Donald, flew to Washington in late February to discuss the book with the defendant. On March 2, 1977 the book was dropped from the plaintiff publisher's spring list and the parties set about negotiating a revised schedule. Because the book had originally been framed as a campaign memoir, the delay in completing the book required also that the topic be restructured, perhaps to include the first year of the Carter presidency. Defendant submitted a proposal to that effect on March 29, 1977, which plaintiff's editors rejected. Thereafter, relations between the parties deteriorated. After a lapse of nearly a year Dr. Bourne submitted a new topic proposal but Little, Brown did not act on it. In the spring and summer of 1979, plaintiff sought to cancel the contract and asked the defendant to return the monies advanced.[1] Plaintiff commenced this action on December 31, 1979.

Under section 3(a) of the Massachusetts long arm statute, the court looks to the defendant's contacts with the forum state. Dr. Bourne was physically present in Massachusetts only once in connection with this book. In March of 1976 he visited Little, Brown offices in Boston with little more than an idea for a book. At most it can be said he was testing the waters, looking for encouragement to continue his efforts. No contract resulted from this meeting. Defendant followed quite a different course in his second effort to find a publisher. In July, 1976, with a more concrete proposal in hand, he put his book out for bids, presumably contacting a number of publishing houses around the country. In offering his book for bids, defendant's contacts with Massachusetts amounted only to mailing a proposal to Little, Brown through his New York agent. Plaintiff happened to be the high bidder (its bid submitted through Sterling Lord in New York) and a contract was successfully negotiated. Under the circumstances we view the one trip to Boston in March as distinct from and unrelated to the events surrounding the contract negotiations in July. Accordingly, for purposes of the long arm statute, this cause of action, which relates to the July contract, cannot be said to arise out of the defendant's transacting any business in Massachusetts when he came here in March.

■ From July 1976, when defendant's agent put his book out for bids, during the contract negotiations and until the alleged breach, defendant did not physically enter the Commonwealth. All contacts with the forum were through the mails and by telephone—both parties sharing in initiating or receiving the letters or phone calls. The publishing process requires frequent communications between author and editors. In this case drafts were received in Boston and circulated among the editors there, the manuscript was marked up for galleys in-house, and letters and outlines were exchanged between Boston and Washington

1. In September, 1977, the editor on the project, Roger Donald, was transferred to Little, Brown's New York office. After that date most, but not all, of the correspondence between the parties was between New York and Washington, D.C.

as a part of the development of the theme and content of the book. Thus, by looking at the whole of defendant's relationship with the plaintiff publisher, and for purposes of literal fidelity to Section 3(a) of the long arm statute, we may conclude that even though defendant was physically absent, he can be held to have transacted business in Massachusetts. Our analysis depends, however, on the important constitutional limitations on our power to exercise jurisdiction over this case. *See, Good Hope Industries, Inc. v. Ryder Scott*, 1979 Adv.Sh. 1155, 1161–62, —— Mass. ——, 389 N.E.2d 76. Were defendant's contacts with the forum such "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,'" *International Shoe Co. v. Washington*, 1945, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, and has defendant "purposely avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws?" *Hanson v. Denckla*, 1958, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283.

Had Dr. Bourne only mailed a proposal to Massachusetts and received back a contract which he signed and returned to Massachusetts, there would have been no basis for asserting personal jurisdiction in Massachusetts. See *"Automatic" Sprinkler Corp. of America v. Seneca Foods Corp.*, 1972, 361 Mass. 441, 280 N.E.2d 423, where the defendant's only contacts with the forum were to mail a purchase order and partial payment to plaintiff's division in Worcester. *See also, Droukas v. Divers Training Academy, Inc.*, 178 Mass.Adv.Sh. 1175, 375 Mass. 149, 376 N.E.2d 548. But where by the nature of the performance called for under the contract the defendant becomes actively involved in plaintiff's business in Massachusetts, for example by monitoring the plaintiff's performance and supervising compliance with specifications and procedures, defendant's contacts are more than that of a passive purchaser and its involvement with the forum is enough to support jurisdiction. *See Whittaker Corp. v. United Aircraft Corp.*, 1 Cir. 1973, 482 F.2d 1079, 1084–85; *Marketing & Distribution Resources v. Paccar, Inc.*, D.Mass. 1978, 460 F.Supp. 990, 994.

The instant case falls somewhere in the middle of these two extremes. Much depends on how we characterize the performance called for under the contract between the parties. In a contract to manufacture goods, for example, a defendant buyer knows that by placing his order he sets off a chain of activity by the plaintiff manufacturer in the forum. However, as a general rule, the plaintiff's activities and conduct in the forum cannot serve as the basis for jurisdiction; and in the case of a passive purchaser the letters and phone calls into the forum which may accompany an order are viewed as ancillary activity without substantial commercial consequence in the forum. *Cf. Good Hope Industries, supra* at 1166, —— Mass. at ——, 389 N.E.2d at 82; *Whittaker, supra* at 1084. Such a rule with respect to manufacturing contracts encourages foreign purchasers to deal with resident sellers without fear of being drawn into litigation in a distant court. *Whittaker, supra*, at 1085.

The contract between the parties in this case, however, bears little, if any, resemblance to a contract to purchase manufactured goods. Full performance by the defendant did not extend simply to writing a book and mailing it to plaintiff's office. The contract called for a manuscript "in content and form satisfactory to the Publisher, . . . in proper shape for the press." Any experienced author understands this to mean that from the bare outline which was the only basis for the publisher's bid, both author and publisher would work together to create a publishable and commercially marketable book. A publishing contract, unlike the basic bilateral contract to purchase a manufactured product, cannot be executed through independent acts of performance. Scores of interdependent acts go into the process: chapters and sections are submitted piecemeal, revisions for style are made in the editors' offices, content is reviewed for legal problems, drafts are circulated and recirculated between author and editor, and eventually printers and proof readers join with the

author and the publisher to make a mutual decision on visual format and style.[2] Whether or not defendant was free to do his writing outside of Massachusetts, he knew that as a consequence of entering into the contract with the plaintiff and mailing each of six chapters to Boston, he set in motion a complicated series of editing and printing steps, in every case unique to the particular author and book.

The pattern and frequency of interaction between plaintiff and defendant resembles that described in *Good Hope Industries, supra.* In that case the defendant, Ryder, provided appraisals and studies of natural gas reserves for its client energy companies. Under Ryder's contract it received raw data from the plaintiff, Good Hope, which it periodically analyzed and reported on. Ryder sent its reports from Texas to plaintiff's offices in Massachusetts. Each report was the occasion for numerous follow-up phone calls between the parties, and plaintiffs relied on the information in these reports in formulating financing and development plans. In concluding that defendant had contacts with Massachusetts sufficient to establish jurisdiction under section 3(a), the court noted:

> We think that by sending appraisal reports and by initiating numerous telephone calls to the plaintiffs at their headquarters in Massachusetts, the defendant undertook purposeful activity in the forum. It reasonably could have foreseen that significant managerial decisions, based on the information it had provided, would be made in Massachusetts. Had the defendant not desired to expose itself

to a claim of Massachusetts jurisdiction, it was within its power to refuse to deal with the plaintiffs here.

*Id.* —— Mass. at ——, 389 N.E.2d at 82. We view Dr. Bourne's contract with Little, Brown as an undertaking of similar dimension and duration; it is neither so unfair nor so unreasonable as to amount to denial of due process to require him to defend this action in this forum.[3] Defendant's motion to dismiss is therefore denied.

### Motion to Transfer Venue

■ Defendant has moved in the alternative to have this action transferred to the District Court for the District of Columbia. In deciding the question of forum non conveniens, the court considers the convenience of the parties and witnesses, and the interests of justice. 28 U.S.C. § 1404(a). Plaintiff's witnesses, six in number, are all from Massachusetts with the exception of Roger Donald, the editor assigned to the Bourne project, who at present is working out of plaintiff's New York office. Besides the defendant himself (who is frequently overseas) the principal defense witness is Sterling Lord, the New York agent. The only other defense witness will be called as an expert on the interpretation of literary contracts. He lives in the District of Columbia and works for the federal government. Considering the predominance of witnesses from Massachusetts and New York, the choice between Massachusetts or the District of Columbia (New York is almost equidistant from either city by plane) probably tends toward Massachusetts as the most convenient forum. In any event, few com-

**2.** A different case might be presented where a manuscript was already written and edited and its author sought only a publisher who would set it into type and market it without changing its contents. The sale of paperback rights to an established hardcover bestseller is such an example. In this case, however, Little, Brown had bid only on a five-page proposal submitted by Dr. Bourne. It must necessarily have been contemplated that together they would create a final, much expanded product, satisfactory to both.

**3.** Section 3(b) of the Massachusetts long arm statute suggests an additional basis for jurisdic-

tion over the defendant. The cause of action arises out of defendant's contracting to supply services (his authorship and cooperation with editing) or things (the manuscript) in the Commonwealth. But we cannot rely on the contract alone, "isolated in nature and void of any other significant contacts with the Commonwealth," *Droukas, supra,* at ——, 376 N.E.2d 554, as the sole source of jurisdiction without giving due consideration to the same constitutional limitations we have here discussed with respect to defendant's transacting business in the Commonwealth.

plicated issues are presented and the trial is not likely to be lengthy. Overall, the inconvenience to the defendant of litigating in Massachusetts is slight—it simply does not rise to the level of hardship that warrants denying plaintiff its primary right to choose a forum. *See, A. Olinick & Sons v. Dempster Bros., Inc.*, 2 Cir. 1966, 365 F.2d 439.

Accordingly defendant's alternative motion to transfer is also denied.