**WHITTAKER CORPORATION,**
**Plaintiff-Appellant,**

v.

**UNITED AIRCRAFT CORPORA-**
**TION et al., Defendants-**
**Appellees.**

**No. 73–1095.**

United States Court of Appeals,
First Circuit.

Heard June 6, 1973.

Decided July 23, 1973.

William M. Simmons, Boston, Mass., with whom Vom Baur, Coburn, Simmons & Turtle, and Thomas J. Mizo, Boston, Mass., were on brief, for appellant.

Stephen A. Moore, Boston, Mass., with whom Michael G. Tracy, and Gaston, Snow, Motley & Holt, Boston, Mass., were on brief, for United Aircraft Corp. and Ladish Co., defendants-appellees.

Christian M. Hoffman, Boston, Mass., with whom Jerome Preston, Jr., John Leubsdorf, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for Gulf and Western Industrial Products Co., defendant-appellee.

Before COFFIN, Chief Judge, and McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

Plaintiff, Whittaker Corporation, incorporated and having its principal place of business in California and its Nuclear Metals Division in Massachusetts, initiated this action against defendants, United Aircraft Corporation, Gulf and Western Industrial Products Company, and Ladish Company (hereinafter United, Gulf, and Ladish) for alleged breach of contract and, as against United only, for alleged actionable deceit. United and Gulf are Delaware corporations which have their respective principal places of business in Connecticut and in a state other than California. Ladish is incorporated and has its principal place of business in Wisconsin. Jurisdiction was based on diversity of citizenship [1] and damages well in excess of $10,000 were alleged. Personal jurisdiction was sought under Fed.R.Civ.P. 4(d)(7) pursuant to the Massachusetts "long arm" statute, M.G.L.A. c. 223A § 3 (1973 Supp.), by serving each corporate defendant by registered mail. Defendants moved to vacate this service alleging that there was no basis for personal jurisdiction and also to dismiss the complaint for improper venue. After a brief hearing on affidavits, the trial

---

[1]. Whittaker also asserted that federal question jurisdiction was present because the contracts in issue were entered into under a prime contract between United and the federal government. This view was not pressed on appeal, however, and we do not see how federal law governs any of the contract or tort claims raised in the complaint.

court granted the motions to dismiss for lack of jurisdiction over the person. This appeal followed. For the reasons set forth below, we reverse as to United but affirm as to Ladish and Gulf.

The underlying facts are not in dispute. In 1963 Whittaker's Nuclear Metals Division, located in Concord, Massachusetts, developed a new procedure known as the Rotating Electrode Process (REP) for the manufacture of metal powder. In 1966 United began purchasing powders produced by this process from Whittaker. In September 1970, after receiving a government contract for the manufacture of jet aircraft engines, United ordered one log of IN 100 metal alloy to be produced by Whittaker using the REP procedure in accordance with its specifications. United informed Whittaker that this log would be tested to determine whether it could become a "qualified and approved" source of logs under the "GATORIZING™" process United was developing to fulfill its jet engine contract.[2] Thereafter Whittaker produced a number of additional test logs in order that it might become qualified to participate in this program. Although the parties' affidavits indicate that all of United's solicitations regarding Whittaker's participation in this program were made either in Florida or Connecticut, they also show that United personnel contacted Whittaker employees in Massachusetts by telephone, teletype, or mail on thirteen occasions and visited Whittaker's Massachusetts facility on four instances during this qualification period.

On or about March 1, 1971, United informed Whittaker that it had become a qualified source of IN 100 logs for use in the GATORIZING™ process. As further conditions to qualification, however, Whittaker was required to sign "Vendor Agreements," in which it promised to make no changes in its source of alloy or its manufacturing process without United's approval, and a "Secrecy Agreement," under which it agreed to keep all other participants in the GATORIZING™ procedure ignorant of the details of the work it performed. Again the parties' affidavits indicate that all of these agreements were made at United's facilities in either Florida or Connecticut.

Following Whittaker's qualification, United notified the turbine disc producers who were participating in the program that they could now use Whittaker as a log source. As a result, Whittaker received an oral order for 9,568 pounds of processed alloy from defendant Ladish on April 30, 1971, and, on May 13, 1971, a similar but larger order from defendant Gulf. On June 1, in spite of the fact that United had discovered a weakness in one of Whittaker's

---

2. Whittaker describes United's GATORIZING™ process as follows:

"*Step One*: The components of IN 100 alloy are melted together in accordance with United specifications by an alloy producer 'qualified and approved' by United who ships the resulting bars to a metal powder producer.

*Step Two*: The metal powder producer (in this case, the plaintiff), reduces the ingots to metal powder, vacuum-packs the powder in a steel can or 'billet' manufactured in accordance with United specifications, and ships the billet to a log producer 'qualified and approved' by United.

*Step Three*: The log producer (in this case, a subcontractor of the plaintiff), in accordance with United specifications and using dies owned by United,

heats, compresses, and extrudes the steel can or billet into a 'log' some ten feet long, seven inches in diameter, and weighing approximately 950 pounds.

*Step Four*: The log producer sends the log to a machine shop which cuts off the steel billet jacket from the log and then cuts the log into smaller segments called 'mults' for shipment to a turbine disc producer 'qualified and approved' by United.

*Step Five*: The turbine disc producers (in this case, Ladish and Gulf), in accordance with United specifications, forge the mults into turbine discs for jet aircraft engines for F–14/F–15 fighters being manufactured by United under United States Government Contract No. F33657–70–C–0660."

test logs and had sent Whittaker revised specifications in an attempt to overcome this defect, United employee LaGrace, while visiting Whittaker's Concord plant, urged Whittaker to proceed with its work on the Ladish and Gulf orders representing that United would not require strict compliance with design specifications. Based upon this representation, in July and August 1971 Whittaker entered into written agreements confirming the Ladish and Gulf oral orders and, in September, entered into a similar agreement for the production of additional logs for United. In the fall of 1971, however, the defendants rejected the logs Whittaker had produced under these agreements alleging that they failed to comply with contract specifications. Although not wholly unambiguous, the parties' affidavits reflect that while none of the defendants was either licensed to do business or had any offices or any agents either soliciting or engaged in any other business in Massachusetts, United's employees did make five visits and send sixteen documents and twenty teletype and telephone messages into the Commonwealth from the time of Whittaker's qualification to the rejection of the logs. During this same period the tally for Ladish was one visit, nine documents, and two phone calls and for Gulf three visits, seven documents, and nine teletype and telephonic messages.[3]

On this background Whittaker sought to obtain personal jurisdiction over all three defendants under § 3(a) and (b) of the Massachusetts long arm statute, M.G.L.A. c. 223A (1973 Supp.) and, additionally, over United under § 3(c).[4] Specifically, Whittaker contended that the defendants were amenable to service of process under § 3(a) because the contacts set forth above indicated that they were all transacting business within Massachusetts and under § 3(b) because all of them had supplied design specifications to Whittaker to govern its performance of the contracts in question. Jurisdiction over United under § 3(c) was posited upon its allegedly deceitful representation that strict adherence to contract specifications would not be required. In the alternative, Whittaker sought discovery concerning these issues. The trial court, however, interpreting the most open-ended provision in the statute, § 3(a), concluded that the defendants' conduct "was not substantially different from [the mere placing of orders in the commonwealth] found insufficient" to support personal jurisdiction in the Supreme Judicial Court's recent decision in "Automatic" Sprinkler Corp. of America v. Seneca Foods Corp., 1972 Mass.Adv. Sheets 601, 280 N.E.2d 423 (1972), and granted the motions to dismiss.

On appeal Whittaker reasserts the contentions raised below. Turning first to the "transacting any business" section of the statute, § 3(a), the initial issue which must be resolved is whether, as a matter of state law, Massachusetts

---

3. Whittaker presents somewhat longer lists of contacts for both United and Ladish by including post-rejection incidents in its tally. We do not believe that such incidents should be included in evaluating the extent of defendants' participation in the commercial life of Massachusetts. Since it is not clear from the record when Gulf rejected Whittaker's goods, however, all of the contacts Gulf allegedly had with the forum have been included.

4. M.G.L.A. c. 223A § 3 provides in relevant part:
"A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's
(a) transacting any business in this commonwealth;
(b) contracting to supply services or things in this commonwealth;
(c) causing tortious injury by an act or omission in this commonwealth;
(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth. . . .'"

has "provided for bringing . . . foreign corporation[s] into its courts under the circumstances of the case presented." Pulson v. American Rolling Mill Co., 170 F.2d 193, 194 (1st Cir. 1948). See Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir. 1963). In the instant case, however, since § 3(a) has recently been construed "as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States," "Automatic" Sprinkler Corp. of America v. Seneca Foods Corp., supra, 280 N.E.2d at 424, this question gives way to a second inquiry, namely whether the state's jurisdictional assertion offends the due process requirements of the fourteenth amendment. The parameters of this second inquiry are, of course, well settled. Where a foreign corporation has established "certain minimum contacts" with the forum so "that the maintenance of the suit [would] not offend 'traditional notions of fair play and substantial justice,'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), and has "purposely avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), jurisdiction will be upheld. Within this constitutional framework a number of factors, including the nature and purpose of the contacts, the connection between the contacts and the cause of action, the number of contacts, the interest of the forum, and the convenience and fairness to the parties must be considered. See,

e. g., Seymour v. Parke, Davis & Co., 423 F.2d 584, 586–587 (1st Cir. 1970); Aftanase v. Economy Baler Company, 343 F.2d 187, 197 (8th Cir. 1965).

In analyzing these criteria we note at the outset that we cannot subscribe to defendants' theory that the instant case is controlled by "Automatic" Sprinkler, supra, since, as we read the complaint and affidavits, it seems clear that defendants' contacts with Massachusetts were more substantial than those found in that case. In "Automatic" Sprinkler [5] the defendant's only contact with the Commonwealth was its mailing of a purchase order and check in partial payment to plaintiff's division in Worcester and its receipt of a letter and invoice mailed from that location. This was held to be an insufficient basis to support long arm jurisdiction under § 3(a). In the case at bar, however, in addition to the fact that each of the defendants had more numerous contacts with the forum, it is undisputed that the defendants, or at least United, supplied the design specifications and work statements which governed Whittaker's performance and also that all of Whittaker's production took place in the Commonwealth. Under these circumstances, while we view "Automatic" Sprinkler as instructive as to the approach of the Massachusetts courts in construing long arm legislation, we cannot agree that it disposes of the instant case.

Turning next to the conduct of the individual defendants, as an initial matter we note that United's activities in the forum were clearly more extensive than those of either Ladish or Gulf. In the

---

5. The Massachusetts contacts in "Automatic" Sprinkler arose in the following manner: defendant, a New York corporation, telephoned plaintiff's New Jersey office and was referred to one of plaintiff's salesmen employed in Canada. When the salesman visited defendant in New York, he informed defendant that the machine it wished to purchase would be built in Ohio. One week later defendant mailed a signed purchase order to plaintiff's division in Worcester, Massachusetts. The Worcester office then sent defendant an invoice and letter acknowledging the order by return mail. Defendant communicated with plaintiff's Ohio division throughout production and eventually the machine was delivered directly from Ohio to New York. After defendant made a single partial payment by mail to Massachusetts, plaintiff sued in Massachusetts to recover the unpaid balance.

first place, it was only after United's solicitation that Whittaker initiated its attempt to become a qualified participant in the GATORIZING™ process. During the pre-qualification period, in addition to supplying the specifications and procedures which governed Whittaker's performance,[6] United personnel regularly communicated with and frequently visited Whittaker's Concord facility. From these facts, it seems a fair inference that United either actively supervised or actually participated in Whittaker's initial development of the alloy logs. In the period following qualification the contacts continued to be extensive. In spite of the failure of one of its logs, United encouraged Whittaker to proceed with work on the Gulf and Ladish orders. Moreover, throughout the project United monitored Whittaker's performance by purchasing and testing additional logs and by amending specifications when defects came to light. *Cf.* Atwood Hatcheries v. Heisdorf & Nelson Farms, 357 F.2d 847 (5th Cir. 1966).

On this background the extent of United's participation in the economic life of Massachusetts seems clearly to rise above that of a purchaser who simply places an order and sits by until the goods are delivered. *See* In-Flight Devices Corporation v. Van Dusen Air, Inc., 466 F.2d 220, 232–233 (6th Cir. 1972). The trial court's characterization of United's conduct as merely "ancillary activity undertaken . . . in connection with [its] order" thus seems somewhat inappropriate. Moreover, it would not be unfair to require United to defend this action in Massachusetts.

Given the five year history of prior dealing between the parties, United may not claim surprise at being expected to appear in this forum. Finally, since United's allegedly deceitful representation concerning non-compliance with specifications was made in Massachusetts, an independent basis for jurisdiction under § 3(c) of c. 223A exists. As we noted in construing this provision in Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 663 (1st Cir. 1972), "if plaintiff alleges that defendants' agents made misrepresentations to him personally within Massachusetts, defendant would without question be within the jurisdiction of the court." United's response that this count fails to state a claim because the complaint contains no allegation that this representation was made with the intent to cause injury does not withstand scrutiny since the pleadings provide that this statement "was a representation of the existing state of mind of United" which was "false with the direct and proximate result that the Plaintiff has been damaged. . . ." Even under the more stringent standards of Rule 9(b), Fed.R.Civ.P., these allegations were sufficient. For all of these reasons, we conclude that the trial court erred in granting United's motion to dismiss.[7]

Whether jurisdiction exists over Ladish and Gulf is more troublesome, however, since both seem to fall more clearly into the category of passive purchasers. First, it is undisputed that neither had any contact with Whittaker in Massachusetts during the pre-qualification period. Only after United in-

---

6. Whittaker argues that because United supplied these specifications for its use in Massachusetts a separate basis for jurisdiction under c. 223A, § 3(b) exists. *See* note 4, *supra.* We prefer, however, to treat this factor as just one more indication of United's transaction of business within the Commonwealth.

7. United contends in the alternative that it is entitled to a dismissal because venue is improper in Massachusetts. Under 28 U.S.C. § 1391, the provision

which governs venue in this action, proper venue would be present if either the claims arose or the plaintiff or all of the defendants resided in the Commonwealth. Since the allegedly deceitful representation was made in Massachusetts and since compliance with the allegedly "impossible design specifications," which gave rise to the contractual claims in issue, was attempted in the state, we conclude that the claims arose there and that venue is proper.

formed them that Whittaker was approved did they place their respective orders. Throughout the production period, moreover, their contacts were limited and not suggestive of the type of supervision or participation in which United apparently engaged. Gulf's only visits to Massachusetts, for example, took place after Whittaker had made its initial shipments. Whittaker's attempt to portray Gulf and Ladish as more active participants is also not persuasive. Its allegation that they, like United, provided design specifications is not supported by the record since it is clear from the complaint that all work was performed in accordance with United's directions.[8] Moreover, for Whittaker to have used specifications other than those provided by United would have been violative of the Vendor Agreements it executed in order to achieve qualification.[9] Finally, since there is no record of any prior dealing between either Ladish. or Gulf and Whittaker, and since there was apparently no requirement in any of the agreements that performance take place in Massachusetts, these defendants may more legitimately claim surprise at being required to defend these charges in this forum.

From the foregoing, we conclude that the primary contact these two defendants had with Massachusetts was Whittaker's performance of their contracts within the Commonwealth. The remainder of their activities may properly be characterized as "ancillary" to the placement of these orders. While entering into a manufacturing agreement with the resident of a forum has been held to

be sufficient to support long arm jurisdiction, *see* Simpson Timber Co. v. Great Salt Lake Minerals and Chemical Corp., 296 F.Supp. 243 (D.Ore.1969); *cf.* W. A. Kraft Corp. v. Terrance on the Park, Inc., 337 F.Supp. 206 (D.N.J.1972), this result has been severely criticized as rendering all purchasers subject to long arm jurisdiction. *See, e. g.,* McQuay, Inc. v. Samuel Schlosberg, Inc., 321 F. Supp. 902 (D.Minn.1971); Geneva Industries, Inc. v. Copeland Construction Corporation, 312 F.Supp. 186 (N.D.Ill. 1970); Oswalt Industries, Inc. v. Gilmore, 297 F.Supp. 307 (D.Kan.1969); *cf.* In-Flight Devices Corporation v. Van Dusen Air, Inc., *supra,* 466 F.2d at 227, n. 13. Further, the interest of the forum in not discouraging foreign purchasers from dealing with resident sellers for fear of having to engage in litigation in distant courts undercuts such an expansive interpretation. *See, e. g.,* Fourth Northwestern National Bank of Minneapolis v. Hilson Industries, Inc., 264 Minn. 110, 117 N.W.2d 732, 736 (1962); Conn v. Whitmore, 9 Utah 2d 250, 342 P.2d 871, 874–875 (1959). For these reasons, as well as the absence of any Massachusetts authority construing c. 223A § 3 in so broad a manner, we conclude that the trial court did not err in granting Ladish's and Gulf's motions to dismiss.

One further matter remains. As an alternative to the dismissal of any of the defendants, Whittaker argues that it is entitled to discovery of jurisdictional facts and, in particular, to investigate whether United was acting as an agent for either Gulf or Ladish.

---

8. For example, paragraphs 58 and 59 of the complaint state:

"58. Plaintiff's adherence to Defendant United's hereinabove described 'GATORIZING ™' process design specifications, work statements and vendor agreements as required by Plaintiff's hereinabove described contracts with Defendants United, Gulf and Ladish made compliance by Plaintiff with the Defendants' interpretation of the said Section E101 criteria for acceptable inclusions impossible.

"59. The issuance of the said impossible specification Section E101 by Defendant United and the requirement of Defendants United, Gulf and Ladish that Plaintiff adhere to such impossible specification are breaches of the aforesaid Defendants' contracts with Plaintiff."

9. For these reasons we conclude that Whittaker's contention that jurisdiction over Gulf and Ladish may be obtained under § 3(b) of c. 223A, *see* note 4 *supra,* is without merit.

While we have recognized that discovery concerning jurisdictional issues is appropriate where complex factual matters are in question and where a party has been diligent and is somewhat unfamiliar with his adversary, Surpitski v. Hughes-Keenan Corp., 362 F.2d 254 (1st Cir. 1966), "the discovery rules [do] vest broad discretion in the trial court which should not be overruled without a showing of abuse." H. L. Moore Drug Exchange, Inc. v. Smith, Kline & French Laboratories, 384 F.2d 97 (2d Cir. 1967). In the instant case, as Whittaker acknowledges, Gulf's answer of May 25, 1972, placed it on notice that personal jurisdiction would be challenged. In spite of this fact, no attempt to initiate discovery on this issue was made until after the motions to dismiss were granted. In addition, as the record indicates, the trial court was aware of Whittaker's agency theory, cf. Murphy v. Erwin-Wasey, Inc., supra, 460 F.2d at 665, and apparently found it to be without substance. Given the detailed allegations in the complaint concerning United's representations to Whittaker about the GATORIZING ™ procedure, the conclusion that Whittaker would have known if United was acting as an agent for the other defendants was not unwarranted. Under these circumstances, and also because Whittaker did not specify any additional pertinent avenues of inquiry,[10] the trial court's denial of discovery may stand.

The order of the district court dismissing the suit as to Ladish Company and Gulf and Western Industries Products Company is affirmed, and the order of the district court dismissing the suit as to United Aircraft Corporation is vacated and that part of the case is remanded for further proceedings consistent with this opinion.

---

10. The only other area of inquiry which Whittaker has expressed interest in pursuing, whether jurisdiction over United may be obtained under § 3(d) on the basis of misrepresentations it may have made to Whittaker outside Massachusetts, is no longer necessary in light of our disposition.