BOND LEATHER CO., INC.,
Plaintiff, Appellee,

v.

Q.T. SHOE MFG. CO., INC. and Martin
S. Nadler, Defendants, Appellants.

BOND LEATHER CO., INC.,
Plaintiff, Appellee,

v.

Q.T. SHOE MFG. CO., INC., et al.,
Defendants, Appellees,

Melvin Nadler, Inc.,
Defendant, Appellant.

Nos. 84–1344, 84–1345.

United States Court of Appeals,
First Circuit.

Argued Feb. 7, 1985.

Decided June 18, 1985.

Lee H. Kozol, Boston, Mass., with whom Sharon L. Sorokin and Friedman & Atherton, Boston, Mass., were on brief for Melvin Nadler, Inc.

Burton Nadler, Boston, Mass., for Q.T. Shoe Mfg. Co., Inc.

Peter J. Arvanites, Boston, Mass., with whom Ankeles, Harmon & Bonfanti, Peabody, Mass., was on brief for plaintiff, appellee.

Before BREYER and TORRUELLA, Circuit Judges, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

Plaintiff, Bond Leather, Inc. ("Bond"), appellee here, brought this action against Martin S. Nadler ("Martin") and Melvin Nadler ("Melvin"), brothers; Q–T Shoe Manufacturing, Inc. ("Q–T"), a corporation of which Martin is president; and Melvin Nadler, Inc. ("M.N., Inc."), a corporation of which Melvin is president and sole stockholder. The gist of Bond's claim was that Q–T owed it money for goods purchased on credit and that, shortly before Q–T failed as a corporation, Martin fraudulently induced Bond to release M.N., Inc. from an agreement under which M.N., Inc. had guaranteed payment to Bond for Q–T's purchases. Following a bench trial, the district court entered judgment in Bond's favor against all defendants, except Melvin Nadler individually, against whom all claims were dismissed. This consolidated appeal followed. Appellant M.N., Inc. now argues that it was not properly subject to the jurisdiction of the court below; appellants Martin Nadler and Q–T allege a number of legal errors in the district court's findings as to their liability. We reverse as to M.N., Inc. and affirm as to Martin and Q–T.

---

* Of the District of Rhode Island, sitting by designation.

## BACKGROUND

The record supports the following factual findings. For many years preceding the events at issue here, Q–T, a New Jersey shoe manufacturing corporation, purchased raw leather from Bond, a Massachusetts corporation. In 1978, Martin, Q–T's president and majority stockholder, was injured in an accident that prevented him for over a year from playing an active role in the company's affairs. During this period, Q–T experienced severe business losses. In the summer of 1979, Q–T negotiated an agreement with its creditors, including Bond, that enabled it to tender twenty cents on each dollar it owed in full satisfaction of its debts. Together with securing a large federally insured loan, this compromise agreement enabled Q–T to continue in business. In view of Q–T's precarious financial condition, however, Bond was willing to continue to extend it credit only upon receipt of assurances that it would be fully paid. Martin proposed that his brother Melvin's Ohio corporation guarantee Q–T's debts. Bond agreed, telephoned Melvin in Cincinnati, and discussed terms for the guaranty. Shortly thereafter, on January 28, 1980, Melvin sent Bond a letter setting forth the terms of M.N., Inc.'s guaranty. Over the next three months, the terms of the guaranty were modified until a final version was executed in an April 7, 1980 letter from Melvin to Bond. That letter agreed to guarantee payment for all Q–T's purchases, without limitation as to time or amount. The record reflects that the negotiations which produced the final document took place in conversations between Martin and William Salloway, Bond's sales manager. Martin would then relay the modified terms to Melvin, who would then send a letter embodying the terms to Bond. Four such letters were sent in all, including the first and final versions.

Q–T purchased leather from Bond under the terms of this agreement until July, 1981, when Martin told Bond that he wanted his own line of credit and wanted Bond to release M.N., Inc. from its agreement. Martin told Bond vice-president Barry Lerner that Melvin needed the release "immediately" because M.N., Inc. was "in the process of 'going public'" with its stock and that the outstanding, open-ended guaranty was an obstacle to moving forward in that process. Lerner discussed Martin's proposal with others at Bond and later indicated that Bond would give the release if Q–T would pay its credit balance of $58,046.63 down to zero. Martin then told Bond that Q–T could not pay that sum quickly enough to meet his brother's needs. It was finally agreed that Q–T would pay half the balance, or $29,026.52, and that Bond would unconditionally release M.N., Inc. from its guaranty. On July 17, 1981, Martin sent Bond a letter of release along with the promised half payment. Bond returned the release to Q–T, signed, on July 27, 1981.

Approximately one and a half months later, in late August, 1981, Q–T failed and its assets were seized. Bond separately notified both Melvin and Martin that it believed Bond had been deceived into granting the release by Martin's representation that M.N., Inc. was in the process of making a public offering of its stock. Melvin responded by letter, indicating that while he had made some attempts to take his company public, he had no knowledge that those plans had any connection to Bond's release. Rather, he said that he understood the only consideration for the release to have been Q–T's payment of half its debt and noted that the release itself made reference only to the partial payment. No further payments were made to Bond by any of the defendants.

Prior to trial, Melvin and M.N., Inc. twice sought to be dismissed for lack of *in personam* jurisdiction. The court denied both motions pending further development of the facts. In denying the second motion, the court indicated that if the evidence failed to show an agency relationship between Martin and either Melvin or M.N., Inc., it would dismiss the claims against both on jurisdictional grounds. At the close of the plaintiff's case at trial, the court determined that no such agency relationship existed; it therefore dismissed

Melvin, individually, and dismissed all counts against M.N., Inc. alleging wrongdoing. The court declined, however, to dismiss the claim that M.N., Inc. owed Bond money under the guaranty because it believed that, if the release was proven to have been induced by fraud, that release would be ineffective. The court thought that, independent of agency relationship, M.N., Inc. had sufficient contacts with Massachusetts—the four letters of guaranty and the release itself—to support jurisdiction.

The district court proceeded to find that Martin's representations to Bond as to M.N., Inc.'s going public were fraudulent and that Bond would not have released M.N., Inc. from its guaranty had it known that the company was not in the immediate process of going public. This finding proved central to the case. On the basis of this fraud, the court found (1) that Martin had committed the tort of misrepresentation and had violated Mass.Gen.Laws Ann. ch. 93A, § 2 by engaging in an unfair, deceptive trade practice and (2) that, by virtue of the fraud, the release was ineffective and M.N., Inc. was liable to Bond under the term of its guaranty. Having rejected Martin's counterclaim, the court, therefore, ruled that Bond was entitled to recover the sum it alleged it was owed—$29,013.26—plus statutory interest from either Martin or M.N., Inc., under any of the above counts. In addition, the court had previously entered a default judgment against Q–T, which had failed to answer or otherwise defend the action. The court also awarded attorneys' fees to Bond, under the provisions of M.G.L.A. ch. 93A, § 11.

## THE APPEAL BY M.N., INC.

Massachusetts law governs our approach to the question whether M.N., Inc. was amenable to the jurisdiction of the district court. *Hahn v. Vermont Law School*, 698 F.2d 48, 49 (1st Cir.1983) (citations omitted). The Supreme Judicial Court has held, and we have recognized, that two questions must be answered affirmatively in order for a Massachusetts court properly to exercise *in personam* jurisdiction over a nonresident defendant: "(1) is the assertion of jurisdiction authorized by the [Massachusetts long arm] statute, and (2) if authorized, is the exercise of jurisdiction under State law consistent with basic due process requirements mandated by the United States Constitution?" *Good Hope Industries, Inc. v. Ryder Scott Co.*, 378 Mass. 1, 5–6, 389 N.E.2d 76 (1979) (quoted in *Hahn v. Vermont Law School, supra*, 698 F.2d at 50).

We turn first to the statutory inquiry. The parties agree that only one section of the Massachusetts long arm statute is relevant to this appeal. Section 3(a) provides that:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's
(a) transacting any business in this commonwealth....

Mass.Gen.Laws Ann. ch. 223A, § 3(a). The language "transacting any business" is to be construed broadly, *Hahn v. Vermont Law School*, 698 F.2d 48, 50 (1st Cir.1983); *Nova Biomedical Corp. v. Moller*, 629 F.2d 190, 193–94 (1st Cir.1980), and reaches any "purposeful acts by an individual, whether personal, private or commercial." *Ross v. Ross*, 371 Mass. 439, 441, 358 N.E.2d 437 (1976).[1]

**1.** Although the Supreme Judicial Court has said that section 3(a) "functions as 'an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States,'" *Good Hope Industries, Inc. v. Ryder Scott, supra*, at 6, 389 N.E.2d 76 (quoting *"Automatic" Sprinkler Corp. of America v. Seneca Foods Corp.*, 361 Mass. 441, 443, 280 N.E.2d 423 (1972)), it has also been careful to note that the state and federal limits are not entirely coextensive.

Even where "jurisdictional facts sufficient to survive due process scrutiny [are presented], a judge would be required to decline to exercise jurisdiction if the plaintiff was unable to satisfy at least one of the statutory prerequisites." *Id.* at 6, 389 N.E.2d 76. *See Nova Biomedical Co. v. Moller, supra*, 629 F.2d at 192 ("rather than giving way entirely to constitutional considerations, the statutory language imposes an additional set of constraints").

▮ There is no question that M.N., Inc. engaged in the purposeful act of guaranteeing Bond, a Massachusetts corporation, payment for goods sold to Q–T. There is likewise no question that M.N., Inc. mailed four letters to Bond in Massachusetts, and received at least one telephone call from Bond, in the course of negotiating this guaranty.[2] Because § 3(a) does not require that the business transacted have taken place within the physical bounds of the commonwealth, *Good Hope Industries, supra,* 378 Mass. at 10, 389 N.E.2d 76, we believe that M.N., Inc.'s activities are within the reach of § 3(a). *Cf. Hahn v. Vermont Law School, supra,* at 51 ("[t]he purposeful actions of [Vermont Law School] in mailing to [a Massachusetts resident] in Massachusetts application information and an acceptance letter were sufficient, without more, to constitute transacting business under the broadly construed Massachusetts long-arm statute") (footnote omitted).

In arguing that its activities were insufficient to satisfy the statutory requirement, M.N. Inc. points to two sets of cases. First, noting that the guaranty in question was its only Massachusetts-related activity,[3] appellant cites cases in which § 3(a) jurisdiction was found wanting because the defendants' undertakings were thought too isolated or untethered to any ongoing course of business in the commonwealth to constitute the transaction of business there. *See, e.g., "Automatic" Sprinkler Corp. of America v. Seneca Foods Corp.,* 361 Mass. 441, 280 N.E.2d 423 (1972); *Backman v. Schiff,* 84 F.R.D. 132 (D.Mass. 1979); *McClellan v. Woonsocket Institution for Savings,* 466 F.Supp. 943 (D.Mass. 1979). The short answer to these cases is that, more recently than they were decided, the Supreme Judicial Court of Massachu-

setts has said that the *purely statutory* requirement for jurisdiction under § 3(a) may be met where the only contact involved is an "isolated" transaction, or one with "little impact on the commerce" of the commonwealth. In *Good Hope Industries v. Ryder Scott, supra,* the court indicated that while a defendant who engaged in such isolated activity may have contacts "constitutionally insufficient to support jurisdiction under G.L. c. 223A, 3(a)," such a defendant may nonetheless "be viewed literally as having 'transact[ed] ... business' in Massachusetts." *Id.* 378 Mass. at 8, n. 13, 389 N.E.2d 76. We have previously read *Good Hope* to mean that the extent of a nonresident's involvement in the Massachusetts economy is properly relevant to the constitutional, not the statutory dimension of the jurisdiction inquiry. *Nova Biochemical v. Moller, supra,* at 192–193 & n. 2; 194, n. 6. We thus reject the argument that the assertion of jurisdiction under § 3(a) is unauthorized here simply because M.N., Inc. has transacted no business *other than* the execution of the guaranty in question.

The second set of cases upon which appellant relies in arguing that a statutory basis for jurisdiction is absent here is the one concerning jurisdiction over nonresident guarantors. *See Kahn Paper, Inc. v. Crosby,* 476 F.Supp. 1011 (D.Mass.1979); *First National Bank of Boston v. Bergreen,* 11 Mass.App. 956, 417 N.E.2d 50 (1981); *Salter v. Lawn,* 294 F.Supp. 882 (D.Mass.1968). In *Kahn Paper,* on which appellant places special reliance, the court held that § 3(a) conferred no jurisdiction over a nonresident guarantor who executed a guaranty in Connecticut, to assure payment for purchases made by a Connecticut buyer, from a Massachusetts seller. M.N., Inc. contends that the "determinative juris-

---

**2.** We do not include on the list of relevant transactions any communications which followed the July, 1981 letter purporting to release M.N., Inc. from its guaranty. *See Whittaker Corp. v. United Aircraft Co.,* 482 F.2d 1079, 1082, n. 3 (1st Cir.1973).

**3.** The parties do not dispute the fact that M.N., Inc. has no office, agents, phone or presence of

any kind in Massachusetts, nor has it had any other dealings with Bond. It is likewise undisputed that neither Melvin nor Martin Nadler has any financial interest in the business of the other, nor does either hold any position or office in his brother's company. The record reflects no commercial ties between Q–T and M.N., Inc., other than the guaranty in question.

dictional facts," Appellant's Brief, at 11, there are identical to those presented here. The facts are quire similar; indeed, the facts in *Kahn Paper* may have leaned more toward jurisdiction because the guarantor there, unlike M.N., Inc., had a substantial financial investment in the Connecticut corporation whose debts he guaranteed. We decline, however, to adopt the approach taken in that case; there, the court relied principally, if not exclusively, on the fact that much of the activity surrounding the guaranty, including its execution, occurred in Connecticut and that the guarantor "never personally transacted any business in Massachusetts." 476 F.Supp. at 1013. Because the Supreme Judicial Court has, since *Kahn Paper,* held that physical presence is not required to satisfy § 3(a), *Good Hope, supra,* and because we have eschewed jurisdictional analyses which rely too heavily on the formalities of contract law, *Vencedor Manufacturing Co., Inc. v. Gougler,* 557 F.2d 886, 890 (1st Cir.1977), we conclude that the factors singled out in *Kahn Paper* should not be determinative of this statutory question and that a nonresident who mails to a Massachusetts party four letters evidencing a single guaranty of payment for goods sold by that party has satisfied § 3(a). Whether jurisdiction may be exercised over that nonresident must depend on whether his contacts with the forum satisfy the requirements of due process as well.

The familiar constitutional inquiry focuses on whether M.N., Inc.'s contacts with Massachusetts were such that requiring it to defend a lawsuit there does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Centrally relevant to this question is whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws," *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). Applying these standards, we conclude that

M.N., Inc.'s contacts are insufficient to satisfy the requirements of due process.

We have held that the fact that a nonresident enters into a single commercial contract with a resident of the forum state is not necessarily sufficient to meet the constitutional minimum for jurisdiction. In *Whittaker Corp. v. United Aircraft Corp.,* 482 F.2d 1079 (1st Cir.1973), we upheld jurisdiction over only one of three defendants who had contracted with a Massachusetts seller to purchase materials to be used in the manufacture of aircraft engines, because only that defendant had, in addition to entering into the contract, solicited, regularly visited and communicated with, and supervised the performance of, the plaintiff. We concluded that only that defendant could fairly be said to have "participate[ed] in the economic life of Massachusetts," *id.* at 1084, and could, therefore, be constitutionally made to defend a lawsuit there. *See* Note, *Long Arm Jurisdiction in Commercial Litigation: When Is a Contract a Contact?,* 61 B.U.L.Rev. 375, 386–389 (1981) (taking view that *Whittaker* "contract plus" analysis is correct). *Whittaker,* which involved purchasers, evinced a special concern for formulating a jurisdictional rule that would protect wholly passive purchasers, who do no more than place an order with an out of state merchant and await delivery. *See id.* at 1084. While the case before us involves a guarantor, we nonetheless believe that the *Whittaker* "contract plus" approach should govern our inquiry here. In both contexts, the nonresident party has plainly taken action with commercial consequences in the commonwealth, yet in neither context is the party truly akin to a seller who solicits revenue from a resident of the forum state. *Cf. McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (upholding California jurisdiction over Texas insurer based on a single insurance policy issued to California plaintiff because insurer derived profit from California market and California had special interest in providing state forum for claims against foreign insurers). In both contexts, therefore, the inquiry must nar-

row to whether the commercial action taken, in light of the contacts with the forum state it entailed, amounts to a purposeful decision by the nonresident to "participate" in the local economy and to avail itself of the benefits and protections of the forum. Thus, we reject appellee's argument that, *solely* by guaranteeing it payment for goods sold to Q–T, and thereby inducing it to sell goods, M.N., Inc. made a purposeful decision which is *independently* sufficient to support jurisdiction. *Accord First National Bank of Boston v. Bergreen, supra* (jurisdiction proper over nonresident guarantors only because guarantees are in aid of their own substantial investment in a Massachusetts corporation); *Salter v. Lawn, supra* (jurisdiction proper over nonresident guarantor who guaranteed loans of corporation doing its principal business in Massachusetts where corporation acted as defendant's agent).

Scrutinizing the record before us, we find absolutely no supplemental contacts linking M.N., Inc. to Massachusetts. The guaranty agreement called for no active role by M.N., Inc., nor did M.N., Inc. participate directly (after Melvin was first telephoned by Salloway of Bond) in negotiating the agreement's evolving terms. The evidence was that Martin relayed the latest agreement to Melvin, who then sent Bond a letter embodying the terms it had agreed upon with Martin. M.N., Inc.'s role was passive.

Moreover, appellee fails to identify any contract rights created by the guaranty in M.N., Inc., which could have been enforced in the Massachusetts courts and which could fairly be said to represent an intent by M.N., Inc. to reap the benefits of Massachusetts law. While Q–T, the principal obligor, no doubt availed itself of the privilege of doing Massachusetts business, and could have invoked Massachusetts law to protect its rights, it does not follow that its benefits and protections may simply be derivatively ascribed to M.N., Inc. We believe that to casually impute these benefits and protections to M.N., Inc. would be fundamentally inconsistent with the minimum contacts inquiry, which looks to the due process rights of the defendant and "properly focuses on 'the relationship among the *defendant,* the forum and the litigation.' " *Keeton v. Hustler Magazine, supra,* 465 U.S. 770, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)) (emphasis added).

Nor is there any basis, on the record before us, to conclude that any commercial benefits did, in fact, flow to M.N., Inc. as a result of its guaranty. It is undisputed that M.N., Inc. received no compensation for its guaranty. It is similarly undisputed that, unlike the nonresident guarantors in *Bergreen, supra,* and *Salter, supra,* over whom jurisdiction was upheld, M.N., Inc. had no financial interest in Q–T. Nor had M.N., Inc. any plans to acquire such an interest in Q–T. Likewise, the record reflected that M.N., Inc. had no presence in Massachusetts, no direct business dealings with parties there and no intent to initiate its own business dealings with Bond or any other Massachusetts party. Rather than marking any move by it into the Massachusetts marketplace, M.N., Inc.'s action represented an apparently isolated attempt to assist Martin Nadler's flagging corporation in the wake of his illness.

This was doubtless a purposeful act for which some consideration, even if non-pecuniary, flowed to M.N., Inc. Viewing this transaction as a whole, however, we conclude that, absent any intent by M.N., Inc. to exploit the local economy, as has been required not only in prior cases addressing jurisdiction over nonresident guarantors, but more generally in cases upholding jurisdiction, *see, e.g., Keeton v. Hustler Magazine, supra,* 104 S.Ct. at 1481; *Hahn v. Vermont Law School, supra,* at 52; *Nova Biomedical v. Moller, supra,* at 193, n. 3, 195; *Vencedor Mfg. Co., Inc. v. Gougler Industries, supra,* at 893; *Good Hope Industries v. Ryder Scott, supra,* 378 Mass. at 9–12, 389 N.E.2d 76, we cannot say that M.N., Inc., on the basis of its isolated act, availed itself of the benefits of transacting business in Massachusetts and should reasonably have anticipated being haled into

court there, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–298, 100 S.Ct. 559, 567–568, 62 L.Ed.2d 490 (1980). While we recognize that our ruling may sacrifice judicial economy, as well as the convenience of plaintiff Bond, we believe that it would violate traditional notions of fair play and substantial justice to compel M.N., Inc. to defend this action in Massachusetts, rather than in its home state of Ohio. Accordingly, Bond's action against M.N., Inc. must be dismissed for lack of *in personam* jurisdiction.[4]

## THE APPEAL BY MARTIN NADLER AND Q–T SHOE

We turn first to appellant Martin Nadler's claim that the district court erroneously applied governing principles of Massachusetts law, which was applied here, when it found that he fraudulently induced

Bond to release M.N., Inc. from its guaranty.

Recovery in an action for the tort of misrepresentation (sometimes referred to as fraud or deceit) requires a showing that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducting the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage. *Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984) (quoting *Barrett Associates, Inc. v. Aronson,* 346 Mass. 150, 152, 190 N.E.2d 867 (1963)) (citations omitted).

The district court found that Bond justifiably relied on Martin's statement that M.N., Inc. was in the immediate process of going public in releasing him from the guaranty; that M.N., Inc. was not in the

**4.** Just prior to publication of this opinion, the Supreme Court announced its decision in *Burger King v. Rudzewicz,* —— U.S. ——, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), a case involving the question whether Florida, the home state of franchisor Burger King, could properly assert personal jurisdiction over Michigan franchisees of the chain, in litigation arising out of the franchise agreement. While the Court found jurisdiction in *Burger King,* we believe for three reasons that the approach adopted in that case fully supports our result today. First, the Court made clear that, as this court held in *Whittaker, supra,* more is required to support jurisdiction than the mere fact of a contractual relationship with a forum state resident. The Court said:

> If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.... [W]e have emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' ... It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

at ——, 105 S.Ct. at 2185 (quoting *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 316–317, 63 S.Ct. 602, 604–605, 87 L.Ed. 777 (1943)). Sec-

ond, the Court said that a single act can confer jurisdiction only where it creates a "'substantial connection' with the forum," *id.,* —— U.S. at ——, at n. 18, 105 S.Ct. at 2184, n. 18 (quoting *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)). For the reasons set forth at pages 934–935 of this opinion, we believe that M.N., Inc.'s single guaranty forged no substantial connection between it and the Commonwealth of Massachusetts. Third, none of the supplemental contacts relied upon in *Burger King,* nor contacts comparable to them, are present in this case. In *Burger King,* the Court examined the relationship between Burger King's home office and the Michigan franchise, and found that the franchisees had "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* —— U.S. at ——, at 105 S.Ct. at 2186 (quoting *Travelers Health Association v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950)). The Court further noted that, in addition to receiving these "commercial benefits," *id.* —— U.S. at ——, at 105 S.Ct. at 2186, the franchisees maintained a continuous course of mail and telephone communications with Florida headquarters, were required to remit regular payments there, and entered into a franchise agreement that provided that Florida law would govern all disputes, *id.* at —— ——, 105 S.Ct. at 2180. None of these factors are present in the case before us. We think that, arrayed against the rich fabric of contacts in *Burger King,* the record in this case is clearly insufficient to support jurisdiction.

immediate process of going public; and that, absent this statement, Bond would not have executed the release.

■ Martin first argues that his representations to Bond were not actionable because, rather than statements of existing fact, they were "statements of opinion, of conditions to exist in the future, or of matters promissory in nature ..." *Pepsi Cola Metropolitan Bottling Co. v. Pleasure Island, Inc.*, 345 F.2d 617, 622 (1st Cir.1965) (quoting *Yerid v. Mason*, 341 Mass. 527, 530, 170 N.E.2d 718 (1960)). While we agree that statements properly so characterized are not actionable, because "their truth cannot literally be known at the time they are made," *Liberty Leather Corp. v. Callum*, 653 F.2d 694, 698 (1st Cir.1981), we conclude that Martin's statements do not fall into this category. The district court, expressly crediting testimony given by Bond's vice-president, and discrediting testimony given by Martin, found as a fact that Martin "specifically stated that Melvin Nadler, Inc. was *in the process of going public and immediately needed to be released* from the guaranty." Opinion of February 28, 1984, at 4 (emphasis added). Having reviewed the record before us, we see no clear error in this finding and accept this as the statement made by Martin to Bond. In turn, this representation can scarcely be characterized as a mere prediction of future conduct, nor as a statement whose truth could not be ascertained at the time it was made. The statement that M.N., Inc. was "in the process of going public" plainly purported to describe activity already under way. Likewise, the statement that M.N., Inc. required a release "immediately" suggested that there were exigent circumstances, requiring swift action, which existed at the time the statement was made. We simply see no reasonable interpretation of these words, consistent with their ordinary usage, which would allow us to view them as anything other than statements of existing fact.

Martin next argues that, even if deemed factual statements, his representations were not "material" because of their subject matter. To the extent that we understand appellant's argument, he appears to suggest that the fact he represented to Bond—that M.N., Inc. was in the process of going public—bore only a "collateral" relation to the contractual relationship among the parties, *see Hedden v. Griffin*, 136 Mass. 229 (1884), and did not, therefore, deceive Bond as to anything "material." We cannot accept this argument. The record abundantly supports the conclusion that Martin purported to inform Bond of specific and pressing commercial circumstances which made it imperative for Bond to terminate its contractual relationship with Martin's guarantor, M.N., Inc. In light of the long business relationship between Martin and Bond, and the district court's finding that Bond sought to accommodate Martin's concerns about his brother's business in order to continue that relationship, we do not find the subject matter of Martin's representations immaterial. To the contrary, we conclude that Martin's statements fall well within the wide bounds of materiality delineated by the Massachusetts courts:

> A misrepresentation is material if it is shown that the misrepresentation was one of the principal grounds, though not necessarily the sole ground, that caused the plaintiff "to take the particular action that the wrongdoer intended he would take as a result of such representations and that otherwise he would not have taken such action."

*National Car Rental System, Inc. v. Mills Transfer Company*, 7 Mass.App. 850, 852, 384 N.E.2d 1263 (1979) (quoting *National Shawmut Bank v. Johnson*, 317 Mass. 485, 490, 58 N.E.2d 849 (1945)). *Cf.* Restatement of Torts (Second) § 538(2)(a) (1981) ("the matter is material if ... a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question").

Martin's final challenge to the district court's ruling on the misrepresentation issue is his claim that Bond's reliance on his statements was unjustifiable, in light of (1) Bond's familiarity with Q–T's financial dif-

ficulties and (2) the fact that Bond did not itself confirm the accuracy of Martin's representations about M.N., Inc. We find no merit in these arguments.

■ First, we fail to see how knowledge of Q–T's uncertain financial condition is legally relevant to Bond's reliance on Martin's statements that *his brother's company* required an immediate release. We trust that appellant is not making the improbable claim that Bond should have suspected that Martin was only seeking to extricate M.N., Inc. from its commitment before that commitment became costly. Second, Martin's contention that Bond was required to independently investigate whether M.N., Inc. was, in fact, making a public offering of its stock before relying reasonably on Martin's statement to that effect, is unsupported in law. The Massachusetts courts have consistently held that failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation. *See, e.g., Friedman v. Jablonski,* 371 Mass. 482, 486, n. 4, 358 N.E.2d 994 (1976); *Kannavos v. Annino,* 356 Mass. 42, 247 N.E.2d 708 (1969); *Sherburne v. Meade,* 303 Mass. 356, 21 N.E.2d 946 (1939). And because we think that Bond was entitled to believe that the facts in question were matters within Martin's knowledge, *see Geoffrion v. Lucier,* 336 Mass. 532, 535, 146 N.E.2d 654 (1957) (citing *Isenbeck v. Burroughs,* 217 Mass. 537, 105 N.E. 595 (1917)), we conclude that its willingness to rely on his word, in light of the parties' long commercial history, was reasonable as a factual matter. Accordingly, we affirm the judgment finding Martin liable for tortious misrepresentation.[5]

■ In an argument closely linked to those challenging the district court's ruling on the common law misrepresentation issue, Martin next attacks the court's finding that his conduct violated Mass.Gen.Laws Ann. ch. 93A. Relying on section two of that statute, which proscribes "unfair or deceptive acts or practices in the conduct of any trade or commerce," the district court found that Martin's representation to Bond constituted an unfair, deceptive practice under the statute. Martin argues that, to be actionable under ch. 93A, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce," *Levings v. Forbes & Wallace,* 8 Mass.App. 498, 504, 396 N.E.2d 149 (1979), and that his conduct falls short of this standard. He concedes, however, that if we agree with the district court "that there had been a material representation which would have constituted fraud then the appellee would be correct [in arguing that there was a violation of ch. 93A here]." Reply Brief, at 8. Having affirmed the district court's finding on the misrepresentation claim, we, too, think it is clear that the same facts supporting that claim support a violation of ch. 93A, as well. *See, e.g., Purity Supreme, Inc. v. Attorney General,* 380 Mass. 762, 777, 407 N.E.2d 297 (1980) ("[a] practice may be 'deceptive' if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted") (citations omitted); *Levings v. Forbes & Wallace, supra,* 8 Mass.App. at 504, 396 N.E.2d 149 (common law misrepresentation is proper basis for ch. 93A claim). Having properly found the statute to have been violated, the district court was likewise correct in awarding Bond attorneys' fees under section 11 of that statute. *See Raymer v. Bay State National Bank,* 384 Mass. 310, 424 N.E.2d 515 (1981).[6]

---

**5.** We need not address Martin's argument that passive nondisclosure does not constitute actionable fraud under Massachusetts law and that, therefore, the court below erred in denying his motion for summary judgment on Bond's claim that it was defrauded by his failure to apprise it of Q–T's deteriorating financial condition when he sought a release of his brother's guaranty. Having affirmed the district court's judgment against Martin solely on the basis of his affirmative misrepresentations, we intimate no view as to the separate passive nondisclosure question.

**6.** Appellant calls our attention to the court's finding, made in the course of its discussion of the damages available under ch. 93A, that Martin induced Bond to release M.N., Inc. from the

■ Martin finally contends that he may not be held individually liable for actions taken in his capacity as president of Q–T. This claim need not detain us long, for it is settled that a corporate officer who commits a tort is personally liable for his actions and cannot seek refuge in the fact that he was acting for the corporation. *Refrigeration Discount Corp. v. Catino*, 330 Mass. 230, 235, 112 N.E.2d 790 (1953); *Coe v. Ware*, 271 Mass. 570, 572–573, 170 N.E. 732 (1973); *see* 3A Fletcher, *Cyclopedia of the Law of Private Corporations*, § 1143, at 228–230 (1975). Thus, whether or not Martin may fairly be said to have been acting in his official capacity as Q–T's president when he induced Bond to execute the release, no corporate veil shields him from liability for his own fraudulent misrepresentations.

Finally, appellant Q–T argues that the district court erred in denying its motion for relief from the default judgment entered against it.

■ We have said on numerous occasions that motions to set aside default judgments are committed to the sound discretion of the district court and that the district court's decision should not be disturbed unless clearly wrong. *Taylor v. Boston and Taunton Transp. Co.*, 720 F.2d 731, 732 (1st Cir.1983); *American Metals Service Export Co. v. Ahrens Aircraft, Inc.*, 666 F.2d 718, 720 (1st Cir.1981); *American & Foreign Insurance Ass'n v. Commercial Insurance Co.*, 575 F.2d 980, 982 & n. 3 (1st Cir.1978). Review under this standard reflects appropriate recognition of the fact that the district court, familiar with the parties and circumstances, is best situated "to weigh the reasons for and against setting aside a default judgment," *American & Foreign Insurance Ass'n v. Commercial Insurance Co.*, *supra*, 575 F.2d at 983, and to determine whether the moving party has met his burden to show both "good reason for the default and the existence of a meritorious defense," *id.* Having examined the record, we do not find that the district court was clearly wrong in denying Q–T's motion.

First, the district court expressly rejected Q–T's proffered explanation of its failure to answer or otherwise defend itself in the almost two year period in which the action had been pending before trial. Martin Nadler's affidavit said that he believed that only he, and not Q–T, had been served in May, 1982. In the face of a Sheriff's certificate on file with the court, stating that Martin and Q–T had both been served on the same date, as well as the fact that Q–T had been notified of all proceedings and conferences throughout the course of the litigation, we find that the district court was within its rights to reject this explanation.

Second, the record supports the district court's conclusion that Q–T had delayed inexcusably in seeking to set aside the default. The original notice of default was issued on December 1, 1983 and Q–T took no action to remove it. The court entered its default judgment on January 3, 1984, but invited Q–T to move to set that judgment aside. Yet, Q–T chose to do nothing

guaranty because he was embarrassed by his brother's financial assistance, not because he intended to deprive Bond of payment. Martin argues that such a finding as to his motive is fatally inconsistent with the court's ruling that he committed the tort of misrepresentation. We disagree. Whether or not the record supports the district court's view of Martin's motive—and no party challenges it—that motive is, as a matter of law, irrelevant to the question of misrepresentation. Massachusetts law does not even require an intent to deceive, let alone an intent to deprive the plaintiff of money, *see Snyder v. Sperry & Hutchinson Co.*, 368 Mass. 433, 444, 333 N.E.2d 421 (1975), to prove misrepresentation. Rather, the only intent required is the intent that the plaintiff rely on the challenged false statements, *id.* at 445, 333 N.E.2d 421. That showing was plainly made here.

On the basis of its finding as to motive, the district court ruled that Bond was not entitled to double or treble damages under ch. 93A. The statute requires that multiple damages be assessed whenever the violation of its terms is "willful" or "knowing". M.G.L.A., ch. 93A, § 11. Because Bond has not cross-appealed the district court's ruling on this issue, we have no occasion to consider the question. Our silence should not, however, be construed as approval of the district court's reasoning. *See Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365, 1376 (D.Mass.1983), *aff'd* 740 F.2d 59 (1st Cir.1984).

until the morning of trial—one month later. We find no justification for these delays, nor do we find reasonable Q–T's expectation that it could wait until trial began to enter the case.

Third, Q–T failed to meet its burden to show the district court that it had meritorious defenses to Bond's claims, which it would be unfairly prevented from asserting. Because the court expressly allowed Martin to raise Q–T's defenses, such a showing could hardly have been made. It is true that Q–T was unable to raise its counterclaims through Martin. But where, as here, Q–T took no action to participate in this case until the morning of trial, despite the fact that, as we have discussed, it was fairly on notice that it had been served, we find that it must bear the blame for losing the chance to press these counterclaims in this action.

*The judgment of the district court is reversed as to appellant Melvin Nadler, Inc.[7] and affirmed as to appellants Martin S. Nadler and Q–T Shoe.*

---

7. Having affirmed the district court's judgment that the release of M.N., Inc.'s guaranty was procured by fraud, it follows, as a matter of law, that the release was legally ineffective. Lacking *in personam* jurisdiction over M.N., Inc., however, we cannot make any finding as to its liability under the guaranty agreement.