UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-1820

ROY R. DAMON AND ELEANOR M. DAMON,

Plaintiffs - Appellants,

v.

SUN COMPANY, INC.,

Defendant - Appellee.



No. 95-1821

ROY R. DAMON AND ELEANOR M. DAMON,

Plaintiffs - Appellees,

v.

SUN COMPANY, INC.,

Defendant - Appellant.



APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. W. Arthur Garrity, Jr., Senior U.S. District Judge] 



Before

Torruella, Chief Judge, 

Aldrich, Senior Circuit Judge, 

and Selya, Circuit Judge. 



Brian R. Corey, with whom Law Offices of Brian R. Corey was 
on brief for Roy R. Damon and Eleanor M. Damon.
Michael A. Fitzhugh, with whom Michael John Miguel, Cynthia 
S. Phelan and Fitzhugh & Associates were on brief for Sun 
Company, Inc.



July 5, 1996


-2-

TORRUELLA, Chief Judge. Plaintiffs brought suit in TORRUELLA, Chief Judge. 

this case claiming misrepresentation and violation of Mass. Gen.

L. ch. 93A, 11. For the reasons stated herein, we affirm the

decision of the district court.

BACKGROUND BACKGROUND

The parties stipulated to the following facts:

Defendant Sun Oil Company, Inc. (R & M) ("Sun") owned property

located at 225 Brockton Ave., Abington, Massachusetts, (the

"property") from 1971 to 1979. In 1972, Sun built a gasoline

station with underground storage tanks on the property and

operated a retail gasoline station thereafter until November

1977. On or about December 19, 1974, a leaking underground pipe

leading from the underground storage tanks to the pumps released

approximately 2,000 gallons of gasoline. Sun's regional manager

of operations, Robert Laubinger ("Laubinger"), was on the

property after the leak was discovered. On November 21, 1979,

the plaintiffs, Roy Damon ("Damon") and Eleanor Damon (together,

the "Damons"), purchased the property from Sun for $90,000. The

plaintiffs had a right to examine the property by terms of the

Agreement of Sale. The Damons owned the property from 1979 to

March 25, 1992 and operated a retail service station at the

property from June 12, 1980 to January 31, 1991.

On January 31, 1991, the plaintiffs leased the property

to K. Rooney, Inc. ("Rooney"). Since then, Rooney has operated a

retail service station on the property. In November 1991, Rooney

began upgrading the station by installing new pumps and Stage II

-3-

of a vapor recovery system. As digging commenced, the Abington

Fire Department observed petroleum product pooling in the surface

excavations, shut down the construction and notified the

Massachusetts Department of Environmental Protection ("DEP"). On

December 19, 1991, the DEP sent a Notice of Responsibility to the

plaintiffs and Rooney, requiring that a Phase I Limited Site

Investigation Report and Preliminary Assessment Report be

completed. A company hired by Rooney performed the investigation

and issued a report dated October 1992. As part of the Phase I

investigation, monitoring wells were installed and samples of

groundwater were taken and analyzed. As a result of the

discovery of the pollution, Rooney refused to pay rent from

November 1991 to March 1992. The lease agreement between

plaintiffs and Rooney granted Rooney an option to purchase the

property for $600,000. Rooney did not exercise its lease option.

On March 25, 1992, Rooney purchased the property from the Damons

by assuming a first mortgage in the amount of $275,000 and a

second mortgage in the amount of $50,000. Rooney also made a

cash payment of $20,000 to plaintiffs.

The district court's additional findings of fact

included the following. A rupture of an elbow joint in the pipe

which connects the tanks and the pumps caused the 1974 spill,

which closed the station for approximately six weeks. In June or

July 1979, Damon attempted to reach Richard Bunzell ("Bunzell"),

whose name was given on the "For Sale" sign at the station.

After some unsuccessful attempts to reach Bunzell, a Sun

-4-

telephone operator referred Damon to Laubinger, Sun's regional

manager for service station maintenance. The questions Damon

asked Laubinger about the property included an inquiry concerning

the age of the building, and whether Sun had experienced any

problems with the station, particularly with the underground

tanks. Laubinger knew of the 1974 spill, but did not reveal it.

Rather, he answered that it was a "good station" which just

needed to be run by a good operator to be successful. After his

phone conversation with Laubinger, Damon contacted Bunzell and,

after some negotiation, accepted his offer of $90,000. In late

August 1979, Damon and Bunzell met at the property to view the

property. Damon asked about a depression he noticed in the

blacktop near the pumps and Bunzell explained it was caused by

the installation of the first stage of a vapor recovery system.

In response to Damon's question of whether Sun had had any

problems with the underground storage tanks, Bunzell stated, "No,

we've had no problems with it. It's all good."

In 1980 Damon had the three 6,000 gallon underground

gasoline tanks tested for tightness by Getty Oil, Co., his first

gasoline supplier: they tested tight, as they did in May 1984 and

again in January 1991. In 1992, no holes were observed in any of

the underground gasoline tanks or oil tanks. The southern end

of the pit dug around the three gasoline tanks yielded the

highest level of contamination; 101 cubic yards of contaminated

soil were eventually removed for off-site treatment. Finally,

samples of contaminated water collected and examined by the

-5-

company conducting the 1992 Phase I study indicate that the

contamination contained the gasoline additive MTBE ("MTBE"),

which was not added to Sunoco gasoline until 1984.

The Damons brought suit against Sun, alleging common

law misrepresentation and violation of chapter 93A, 11. The

district court, after a four day bench trial, found for the

Damons on both the misrepresentation and the chapter 93A counts,

awarding them $245,000 plus reasonable attorney's fees and costs.

In its appeal, Sun now challenges the three rulings of the

district court -- its denial of Sun's motion for entry of

judgment at the close of plaintiffs' case in chief, see Fed. R. 

Civ. P. 52(c); the district court's judgment and findings

pursuant to trial; and its denial of Sun's post-trial motions to

alter and amend the judgment and findings and for a new trial,

see Fed. R. Civ. P. 59. 

CAUSATION AND DAMAGES CAUSATION AND DAMAGES

A. The Legal Framework A. The Legal Framework 

The Damons charged Sun with the tort of

misrepresentation, also referred to as fraud or deceit. See Bond 

Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 935 (1st Cir. 

1985). The elements of misrepresentation are well established:

in order to recover, plaintiff

must allege and prove that the defendant
made a false representation of a material
fact with knowledge of its falsity for
the purpose of inducing the plaintiff to
act thereon, and that the plaintiff
relied upon the representation as true
and acted upon it to his [or her] damage.

-6-

Barret Assocs., Inc. v. Aronson, 190 N.E.2d 867, 868 (Mass. 

1963) (quoting Kilroy v. Barron, 95 N.E.2d 190, 191 (Mass. 

1950)); see Metropolitan Life Ins. Co. v. Ditmore, 729 F.2d 1, 4 

(1st Cir. 1984). "The party making the representation need not

know that the statement is false if the fact represented is

susceptible of actual knowledge." VMark Software, Inc. v. EMC 

Corp., 642 N.E.2d 587, 593 n.9 (Mass. App. Ct. 1994). Here, the 

alleged false representations are the statements made by Sun's

representatives that it was a "good" station, upon which Damon

relied in his purchasing decision. The alleged harm suffered was

that the Damons bought a gas station in 1979 that would have been

worth more in 1992 if what the defendant's representatives stated

had in fact been true. The damages were measured by the

difference between the value of the property if it had been

uncontaminated, as the defendant represented, and the actual

value of the property as contaminated.

Appellant questions the district court's findings

related to two of these elements: causation and damages. The

causation element requires that the misrepresentation be a

substantial factor in the plaintiff's actions, such that it

"tend[s] along with other factors to produce the plaintiff's

[harm]." O'Connor v. Raymark Indus., Inc., 518 N.E.2d 510, 513 

(Mass. 1988). The defendant's conduct need not be the sole cause

of the injury: "'It is enough that [plaintiffs] introduce

evidence from which reasonable men [and women] may conclude that

it is more probable that the event was caused by the defendant

-7-

than that it was not.'" Mullins v. Pine Manor College, 449 

N.E.2d 331, 339 (Mass. 1983) (quoting Carey v. General Motors 

Corp., 387 N.E.2d 583, 585 (1979)). Damages, in turn, must be 

proven "with a fair degree of certainty." Pearl v. William 

Filene's Sons Co., 58 N.E.2d 825, 827 (Mass. 1945); see Squeri v. 

McCarrick, 588 N.E.2d 22, 26 (Mass. App. Ct. 1992) ("While proof 

of damages does not require mathematical precision, it must be

based on more than mere speculation.").

"Following a bench trial, the court of appeals reviews

the trier's factual determinations for clear error, but affords

plenary review to the trier's formulation of applicable legal

rules." Smith v. F.W. Morse & Co., 76 F.3d 413, 420 (1st Cir. 

1996) (citations omitted); see Fed. R. Civ. P. 52(a); Dedham 

Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st 

Cir. 1992). Of course, "to the extent that findings of fact can

be shown to have been predicated upon, or induced by, errors of

law, they will be accorded diminished respect on appeal." Id. 

However, as we have noted in regards to causation,

[a]pplication of the legal cause standard
to the circumstances of a particular case
is a function ordinarily performed by,
and peculiarly within the competence of,
the factfinder. The SJC has consistently
held questions of causation to be for the
factfinder.

Swift v. United States, 866 F.2d 507, 510 (1st Cir. 1988); see 

Dedham Water Co., 972 F.2d at 457 ("As a general rule, causation 

questions are grist for the factfinder's mill."); Mullins, 449 

N.E.2d at 338; see, e.g., Smith, 76 F.3d at 420, 422-24 (applying 

-8-

the clearly erroneous standard to district court's finding of

causation in Title VII context). 

B. Causation B. Causation 

The district court found that the Damons met their

burden of proving "by a preponderance of the evidence that the

2,000 gallon spill was a substantial factor in the DEP decision

that a gasoline contamination sufficient to trigger 21E liability

existed at the [property]." (District Court Findings of Fact and

Conclusions of Law, at 8). Sun argues on appeal that the

evidence that the district court relied on in finding that Sun

more probably than not was a substantial cause of the

contamination found in 1991 is insufficient as a matter of law,

for three reasons. Upon review of the record, however, we find

that the Damons met their burden of proof, such that the district

court did not clearly err in finding that the causation element

of misrepresentation has been met. We address, and dismiss, each

of Sun's arguments in turn. 

First, Sun notes that the district court conceded that

"it is unclear how much of the 2,000 gallons [of the 1974 spill]

was recovered," (District Court Findings of Fact and Conclusions

of Law, at 9), and concludes from that statement that there was

no evidence of what (if any) contamination found in 1991 actually

dated to 1974. The fact that there was a release, without more,

Sun argues, is insufficient to impose liability. 

There is more, however: the district court found not

only that there was a release, but also that the clean-up efforts

-9-

at the time of the release were limited, at best.

Defendant's remedial efforts in 1974 were
not conducted for the purpose of ridding
the property of contamination; rather,
the goal was to make the [property] safe.
To this end, the focus was on stopping
the flow of gasoline onto the neighboring
property -- no effort was made to clean
or remove contaminated soil on the
[property] itself. From the Abington
Fire Department records it is unclear how
much of the 2,000 gallons was recovered.
Presumably, the company hired by Sun to
pump the trenches was pumping a mixture
of gas and water, but no one knows the
relative proportions or the total amount
of mixture pumped.

(District Court Findings of Fact and Conclusions of Law, at 9).

To suggest that the district court's statement that "it is

unclear how much of the 2,000 gallons was recovered" can be read

to imply that it was all recovered is to misread the context of

the statement.

Additional evidence the lower court found determinative

in its finding of causation included the sheer size of the 1974

spill (2,000 gallons); the fact that Robert Cataldo ("Cataldo"),

plaintiffs' expert, testified that the underground pipe which ran

from the pumps to the tanks created a channel along which the

gasoline could flow from the rupture and settle under the tanks;

and that no gasoline spills larger than 10 gallons occurred at

the property between 1974 and 1992, during which time the Damons'

tanks periodically tested tight. Finally, the court also noted

that "Cataldo testified, albeit hesitatingly, that in his opinion

the 1974 spill was a substantial factor contributing to the

contamination found at the [property] in 1992." (District Court

-10-

Findings of Fact and Conclusions of Law, at 10). Clearly, the

evidence the district court relied on in finding causation goes

beyond the simple fact that there was a release in 1974. Sun

does not challenge any of these specific findings; indeed, our

review of the record finds support for each. 

In making its argument, Sun relies on Providence & 

Worcester R.R. Co. v. Chevron U.S.A., Inc., 622 N.E.2d 262 (Mass. 

1993). In that case, contamination was discovered in 1988 on

property owned by the plaintiff railroad. The railroad sued

defendant Chevron, claiming that the 1988 contamination was

caused by a 1972 leak of 12,000 gallons of fuel oil from a

storage facility defendant had maintained on the property. The

court found no causal link between the spills, where there was no

evidence that the soil was significantly saturated by the 1972

surface spill, which had been pumped out the same day, where

sixteen years had passed, and where the question whether the oil

would remain in some form was left unanswered in the face of

conflicting evidence. The court specifically noted that the

railroad's expert was not asked to give an opinion whether the

1988 contamination was caused at least in part by the 1972 spill.

Id. at 264.  

Sun draws on Providence & Worcester as demonstrating 

that evidence of the 1974 spill, in and of itself, is

insufficient to impose liability. That may be true, as far as it

goes. The evidence in the present case, however, shows much

more. As in Providence & Worcester, many years passed between 

-11-

the spills in the present case. However, the evidence is that

the 1974 spill was not cleaned up immediately, as in Providence & 

Worcester. Rather, the fire department logs indicate that 

pumping did not start until two days after discovery of the leak

on December 19, 1974: as late as February 4, 1975, more than a

month after the leak was first reported, gasoline fumes were

still being detected in the basement of an adjacent property.

Thus, there was evidence in this case that the soil was

contaminated by the 1974 spill. What is more, plaintiffs' expert

here did state that the 1974 spill was a substantial factor

contributing to the 1991 contamination, as we discuss below.

Sun's second attack on the sufficiency of the evidence

focuses on the soil. In the face of the uncontested fact that

the 1974 spillage was subsurface, due to a leaky underground

pump, Sun contends that no evidence was presented that the soil

was contaminated by Sun, or that Sun's failure to clean up or

remove soil was wrongful. In support of its position, Sun lists

four pieces of evidence regarding soil testing. Firstly, it

notes that soil samples taken in 1992 by consultants were

spoiled, and never analyzed. While it is unfortunate that the

samples were not analyzed, that fact simply shows we do not have

all possible information: it does not shed any light, one way or

the other, on whether the 1974 spillage contaminated the soil.

Secondly, Sun points out that in 1979, Getty Oil commissioned a

company to dig around the fill area above the storage tanks, and

that the company never said anything to Damon about contaminated

-12-

soil, but rather stated that the area was clean. However, Sun

points to no evidence that the company was asked to do an

examination of the soil for contamination: it was testing the

tanks for tightness. Thus, the third fact Sun looks to for

support, that Cataldo's environmental company found contamination

in 1992 around the same fill pipes that Getty Oil, in 1980, had

told Damon were clean, is not as conclusive as Sun would like.

Set against the Getty results is Cataldo's testimony that the

1974 release was a contributing factor in the 1991 contamination.

Finally, Sun notes that Cataldo testified that there was not much

thickness of soil, such that "flushing" of the soil by rising and

falling subsurface groundwater elevations would tend to reduce

any residual contamination. However, Cataldo also testified that

the on-site testing he conducted in four monitoring wells found

volatile organic compounds ("VOCs") which are constituents of

gasoline in the groundwater. The constituents found in 1991, he

stated, were similar to those of the 1974 release. As he stated

in his testimony:

Q. . . . . And based on your
examination of the underground conditions
at that [property] and the geology of the
[property], and based upon the
information of this 2,000 gallon spill in
1974, would you expect to find VOCs in
the areas where you did find them in
1992?
A. Yes, I would.
Q. Is the presence of VOCs consistent
with the topography and geology of that
[property] and a spill in 1974?
A. Yes, it is.

(Day 2, page 76). On this record, we find that the evidence was

-13-

sufficient to find causation. The evidence to which Sun points

does not convince us otherwise, let alone that the district court

clearly erred in making its finding. 

Sun's third and final argument that the evidence is

insufficient to find causation focuses on Cataldo's testimony.

It is fundamental that "[e]xpert testimony must be predicated on

facts legally sufficient to provide a basis for the expert's

opinion. " In re Salvatore, 46 B.R. 247, 253 (D.R.I. 1984). 

Thus, "[a]n expert should not be permitted to give an opinion

that is based on conjecture or speculation from an insufficient

evidentiary foundation." Van Brode Group, Inc. v. Bowditch & 

Dewey, 633 N.E.2d 424, 430 (Mass. App. Ct. 1994). Cataldo's 

testimony, Sun contends, did not meet this criteria. Although

Cataldo testified that the 1974 spill was a "substantial factor"

in the 1991 contamination, Sun argues that its cross-examination

of Cataldo revealed that he had no factual basis for that

conclusion: indeed, he testified at one point that he could not

say that the 1974 spill was "more probably than not" the cause of

the 1991 contamination. 

Sun points to a series of perceived flaws in Cataldo's

testimony. First, Cataldo attested that although methods exist

which would quantify the amount of contaminants found in 1992

which were representative of the 1974 release, none were

performed here. He agreed that he did not know how much gas was

left on the property after the 1974 release, and that none of the

work performed by his firm had to do with aging or dating the

-14-

petroleum product found on the property. Nor did they test to

determine what percentage of the gas found in 1991 was 1974 gas.

After admitting that the ratios of the BTEX chemical constituents

were indicative of a more recent -- post-1980 -- release, Cataldo

testified that he could not say "one way or the other" that the

gasoline constituents encountered in 1992 were more probably than

not the result of the 1974 release. Thus, Sun maintains, the

best Cataldo could testify to at trial was that the property was

insufficiently investigated to allow him to come to any ultimate

conclusions concerning the contaminate sources; that since the

1974 release was the only known release, it at least partially

caused the 1991 contamination; and that there was no way of

apportioning what amounts, if any, of the 1991 contamination were

attributable to Sun based on the work done to date. This

opinion, Sun concludes, is insufficient as a matter of law. 

We disagree. The issue is not whether Cataldo was

right: but, rather, whether he had sufficient factual grounds on

which to draw conclusions. See Van Brode Group, Inc., 633 N.E.2d 

at 430. On the basis of our review of the record, we conclude

that Cataldo's expert testimony was predicated on facts legally

sufficient to provide a basis for his conclusions. There is no

doubt that more testing could have been done on the property,

which would have been helpful to the factfinder. However,

Cataldo noted that although there are methods to attempt to

quantify the amount of contaminants dating back to 1974, he does

not know "if there's anything that really can say, yes or no, how

-15-

much there is." (Day 2, page 133). He drew his conclusions on

the basis of his "experience with dealing with gasoline stations,

residual contamination, [and] the knowledge that the only

significant or large release at the [property] was reportedly the

2,000 gallons in 1974." (Day 2, page 71). He and his personnel

visited the property, investigated its history, and made tests,

from which he drew his conclusions. His testimony reflects his

research: asked how gas spilled in 1974 could still be present

in 1992, he stated,

A. Because the gasoline tends to
absorb and holds in to some of the soil.
It also fills up the pores between the
soil and clings in to that. The
[property] was paved, so that all the
rain that falls in it doesn't get a
chance to percolate through, so you don't
have that complete flushing action that
you would in an open field. Most of the
rainwater probably channeled off, and
that's one of the purposes of blacktop.
So it's my opinion that there would still
be some remnants of the gasoline
remaining.

(Day 2, page 87). He later noted that biodegradation alone would

not have removed contamination of the scale of 2,000 gallons over

18 years, and that there had been a reported release of four

gallons subsequent to 1980, which would be sufficient to account

for the levels of MTBE found. As the district court noted, his

attribution of the contamination, at least in part, to the 1974

contamination, "has an additional earmark of trustworthiness

because it was prepared for a third-party, Rooney, pursuant to an

order of the DEP, and not in any way in anticipation of this

litigation." (District Court Findings of Fact and Conclusions of

-16-

Law, at 11). Cf. Venturelli v. Cincinnati, Inc., 850 F.2d 825, 

832 (1st Cir. 1988) ("The decision of whether an expert is

adequately qualified is a matter primarily for the district

court.").

In arguing that Cataldo's testimony provides

insufficient basis, Sun also relies on Providence & Worcester for 

the proposition that the Damons were "required to bring forth an

expert opinion that the on-site activity on the subject property

during Sun's operation of gasoline station (1972-1977) was more

probably than not a substantial factor in causing the

contamination found on the property in 1992." (Brief of

Appellant, at 19). We disregard this argument, for two reasons.

First, in Providence & Worcester, although the SJC found it 

significant that the railroad's expert did not testify as to

causation, the court specifically noted that it "[did] not say

that expert testimony is required to establish causation in every

soil contamination case." 622 N.E.2d at 264 (noting that the

subject "is not one that jurors would be expected to understand

in many circumstances without guidance from an expert"). We will

not create such a requirement here. Second, even if that

requirement existed, plaintiff met it. Cataldo explicitly, if

reluctantly, testified that the 1974 spill was "a substantial

factor" in the contamination detected in 1991, a fact the

district court noted twice in its finding of causation. In sum,

then, we find that the district court did not clearly err in

finding that Sun's acts were a substantial cause of the DEP

-17-

decision that contamination sufficient to trigger 21E liability

existed at the property. 

We note that the district court's task of determining

causation on this record was not an easy one. Nonetheless,

"[w]hen the evidence supports conflicting inferences, the

district court's choice from among the several inferences cannot

be clearly erroneous." Dedham Water Co., 972 F.2d at 462. Thus 

we uphold the district court, and reject Sun's argument that the

evidence upon which the district court relied is insufficient. 

C. Damages and the Burden of Proof C. Damages and the Burden of Proof 

The parties dispute who bore the burden of proof

regarding whether the harm was divisible. The backdrop to their

dialogue is the fact that the evidence indicates that Sun was not

the only owner or operator of the property whose acts led to the

1991 contamination. As the district court stated, the presence

of MTBE "compel(s) the conclusion that there had been a

widespread release of gasoline at the [property] after 1984, when

MTBE became common." (District Court Findings of Fact and

Conclusions of Law, at 10). Thus, there was at least one release

of gasoline when the property was operated by Rooney or the

plaintiffs. The Damons concede that the evidence and findings

indicate that there was a post-1980 release of gasoline. At the

same time, there was no evidence of a spill greater than 10

gallons, and the district court specifically found that during

-18-

the time the Damons owned the property, no significant leaks

occurred.1

The Damons bear the burden of proving that tortious

conduct by Sun caused them harm. See Restatement (2d) of Torts 

433B(1). They were required to produce evidence that it is

more likely than not that Sun's conduct was a substantial factor

in bringing about the harm they suffered. See id. comment a 

(noting that "[a] mere possibility of such causation is not

enough"). Sun argues that the Damons did not meet their burden

of showing that Sun's conduct substantially caused the harm they

suffered. Accordingly, it maintains, the burden of identifying

what other actors were also responsible for the harm and of

allocating the harm (or showing that it was indivisible) remained

with the plaintiffs, who did not fulfill that task. However, we

have already established above that the district court did not

err in finding that Sun's conduct substantially caused the harm

the Damons suffered. Therefore, the burden shifted to Sun, as

did the cost of not meeting it. See Restatement (2d) of Torts  

433B(2) ("Where the tortious conduct of two or more actors has

combined to bring about harm to the plaintiff, and one or more of

the actors seeks to limit his liability on the ground that the

 

1 Sun argues that the district court's factual findings are
inconsistent. We disagree: the evidence at trial indicated that
a spill as small as four gallons could account for the amount of
MTBE present, and that Cataldo's research found no record of any
spills over ten gallons. The evidence leads to the inference
that a spill made up of less than ten gallons, but which was
nonetheless spread out (or several such spills), could account
for the MTBE found. 

-19-

harm is capable of apportionment among them, the burden of proof

as to the apportionment is upon each such actor."); see also 

O'Neil v. Picillo, 883 F.2d 176, 178 (1st Cir. 1989) (noting, in 

CERCLA action, that rule based on the Restatement (2d) of Torts

requires that damages be apportioned only if defendant shows that

the harm is divisible), cert. denied sub nom. American Cyanamid 

Co. v. O'Neil, 493 U.S. 1071 (1990). Accordingly, we find no 

error in the district court's apparent allocation of the burden

of proof, and need not enter into the parties' dispute over who

bore what burden, and whether divisibility was indeed shown. 

SUFFICIENCY OF THE EVIDENCE SUFFICIENCY OF THE EVIDENCE

Sun challenges the sufficiency of the evidence,

contending that the district court's findings were clearly

erroneous and highly prejudicial to Sun's case in three

instances. We examine such challenges to the district court's

factual findings for clear error. See O'Brien v. Papa Gino's of 

America, Inc., 780 F.2d 1067, 1076 (1st Cir. 1986). To 

demonstrate that the Damons did not meet their burden of proving

misrepresentation by a preponderance of the evidence, Sun "must

show that the verdict was against the great weight of the

evidence, viewed in the light most favorable to [the Damons], or

would work a clear miscarriage of justice." Cambridge Plating 

Co. v. Napco, Inc., No. 95-1781, slip op. at 26 (1st Cir. June 3, 

1996). We address each of Sun's contentions in turn.

A. The Alleged Representations A. The Alleged Representations 

Sun first alleges that the alleged representations were

-20-

opinions and not statements of fact. The distinction is a

crucial one, as it is well established that the latter can

ordinarily be the basis of a claim of fraud, but the former

cannot. See, e.g., Briggs v. Carol Cars, Inc., 553 N.E.2d 930, 

(Mass. 1990) (noting that a statement which is an opinion in form

"in some circumstances may reasonably be interpreted by the

recipient to imply that the maker of the statement knows facts

that justify the opinion"); Coe v. Ware, 171 N.E. 732, 734 (Mass. 

1930). The determination of whether a statement is of opinion or

fact is a factual one, see id., and so we review only for clear 

error. 

The district court held that

It should have been clear from Damon's
questions [to Sun's agents] that he was
concerned about the past and future
integrity of the entire underground gas
delivery system; as Damon testified at
trial, "the only thing you've got in a
gas station is tanks and pumps and the
lines. I mean, what else is there?"

(District Court Findings of Fact and Conclusions of Law, at 7

n.1). Sun contends that there is no evidentiary basis for such a

finding. Seeking support, it points to the district court's

statement during closing arguments that

the testimony that [Damon] had, that they
told him it was a good station, is not
significant in my view because that's
absolutely an opinion rather than a
statement of fact.

(Day 4, page 15), and contends that by making this comment the

district court essentially conceded that there was no evidentiary

basis to find that the statements by the Sun employees were

-21-

opinion. To the contrary, all this statement reveals is that the

district court changed its mind as to the significance of the

statements, which is certainly within its province to do.

Indeed, that is the very mission of closing arguments: to

convince the factfinder that a party's view of the facts is

correct. 

Similarly, that Damon's testimony about the

conversations could be viewed as inconsistent, as Sun notes, is a

question that addresses Damon's credibility, not the district

court's finding. Credibility, of course, is an issue for the

factfinder, and Sun has shown us no clear error in the district

court's judgment on the matter. See O'Brien, 780 F.2d at 1076 

("No subject matter is more clearly within the exclusive province

of the fact-finder than this.").

Our review of the record leads us to affirm the

district court's finding that the statements were factual in

nature. First, we note that the evidence supports the findings.

The court found that Damon asked Bunzell if Sun had had any

problems with the underground storage tanks, to which Bunzell

responded that Sun had had "no problems with it. It's all good."

(District Court Findings of Fact and Conclusions of Law, at 5).

This is consistent with Damon's testimony at trial. Bunzell's

testimony did not contradict him, since he stated in his

affidavit, entered at trial, that he neither remembered the sale

of the property nor recalled any discussion of it or the terms of

the sale. The district court also found that although Laubinger

-22-

knew about the 1974 spill -- indeed, he visited the property at

the time -- he did not reveal the information to Damon. Instead,

he responded to Damon's questions about whether Sun had any

problems with the station, particularly with the underground

tanks, by stating "that it was a 'good station' which just needed

to be run by a good operator to be successful." (District Court

Findings of Fact and Conclusions of Law, at 5). This was

consistent with Damon's testimony at trial. Laubinger testified

that he did not recall having a telephone conversation with Damon

or ever not telling anyone about the release in discussing the

property, and the trial court was free to credit Damon's more

specific recollection. 

Next, in discussing whether the Bunzell and Laubinger

statements were opinions or fact, the district court noted that

Damon's questions were not just about the current conditions on

the property. If they had been, their statements that it was a

good station would presumably have been opinion. Rather, the

district court specified that the questions also went to whether

there had been problems in the station in the past of which Damon

should be aware, with the underground tanks specifically. In

that context, reading the record in the light most favorable to

the Damons, we do not find that the district court erred in

finding that the Sun representatives' statements that it was a

"good station" were factual. Indeed, we are hard put to see how,

where there has been a spill of 2,000 gallons in 1974, which Sun

knew of, statements five years later that it was a "good station"

-23-

and that Sun had had "no problems with it" in reply to a question

regarding the underground tanks are not misrepresentations of

fact.

B. Evidence of the Elements of Fraud B. Evidence of the Elements of Fraud 

Sun's second contention is that the record contains no

evidence of the key elements needed to prove fraud. First, Sun

asserts that the statements by Bunzell and Laubinger were not

misrepresentations of material facts, and thus the first element

of the tort has not been shown. See Barret Assocs., Inc., 190 

N.E.2d at 868 (noting that the first element is that "defendant

made a false representation of a material fact"). We disagree.

There can be no doubt that the statements were misrepresentations

in terms of the past history of the property: stating that it is

a "good station" ignores the fact that there was a 2,000 gallon

spill. It may have been a "good station" in 1979, from Sun's

perspective: the spill had been cleaned up in accordance with

the requirements of the time, and there is no evidence of other

problems. Nonetheless, there had been a problem in the past, and

to omit that was to misrepresent the situation. The district

court found that the fact was material, as it gave credence to

Damon's testimony that his affiliation with a car dealership

which sold gasoline gave him a general awareness of the growing

importance of environmental issues, and that he would not have

bought the station had he been aware of the spill. Thus, the

statements by the Sun representatives were certainly "'one of the

principal grounds, though not necessarily the sole ground, that

-24-

caused the plaintiff[s] "to take the particular action that the

wrongdoer intended he would take as a result of such

representations."'" Bond Leather Co., 764 F.2d at 936 (quoting 

National Car Rental Sys., Inc. v. Mills Transfer Co., 384 N.E.2d 

1263 (Mass. App. Ct. 1979) (quoting National Shawmut Bank v. 

Johnson, 58 N.E.2d 849 (Mass. 1945))). While this testimony is 

undoubtedly in Damon's interest, the district court's credence in

that testimony has not been shown to be in error. See O'Brien, 

780 F.2d at 1076. Finally, we have already established that

these were factual statements. Thus, the statements were

misrepresentations of material facts.

Sun tries to fend off this conclusion by pointing out

that "[s]ellers . . . are not liable in fraud for failing to

disclose every latent defect known to them which reduces

materially the value of the property and of which the buyer is

ignorant." Nei v. Burley, 446 N.E.2d 674, 676 (Mass. 1983). 

However, it is well established that "in Massachusetts . . . a

party who discloses partial information that may be misleading

has a duty to reveal all the material facts he [or she] knows to

avoid deceiving the other party." V.S.H. Realty, Inc. v. Texaco, 

Inc., 757 F.2d 411, 415 (1st Cir. 1985); cf. Nei, 446 N.E.2d at 

676 (finding no misrepresentation where seller "did not convey

half truths . . . [or] make a partial disclosure of the kind

which so often requires a full acknowledgement to avoid

deception"). Accordingly, we find Maxwell v. Ratcliffe, 254 

N.E.2d 250, 252 (Mass. 1969), analogous to the Damons' position.

-25-

In that case, potential buyers of a house asked whether the

cellar was dry, and the brokers represented that it was, when

they had, or should have had, knowledge that there was periodic

water seepage. The Court found that "because the question of the

dryness of the cellar had been raised expressly, there was

special obligation on the brokers to avoid half truths and to

make disclosure at least of any facts known to them or with

respect to which they had been put on notice." Id. at 252-53; 

see Greenery Rehabilitation Group, Inc. v. Antaramian, 628 N.E.2d 

1291, 1294 (Mass. App. Ct. 1994) (noting, inter alia, that buyers 

did not request financial information about tenant from seller in

finding that situation was not a case of partial disclosure). 

Sun also seeks support from the fact that Damon signed

an agreement representing that he had inspected the property and

would indemnify Sun from and against liability for violation of

environmental laws. However, "Massachusetts case law

unequivocally rejects assertion of an 'as is' clause as an

automatic defense against allegations of fraud." V.S.H. Realty, 

Inc., 757 F.2d at 418 (noting also that Uniform Commercial Code  

2-316, which allows disclaimers in the sale of goods between

merchants, does not preclude claims based on fraud); see Turner 

v. Johnson & Johnson, 809 F.2d 90, 95-98 (1st Cir. 1986) 

(discussing basis and limits of Massachusetts rule that parties

may not contract out of fraud). Nei v. Burley, which Sun cites, 

offers it no support. There, the court relied on the absence of

a duty to disclose the latent defect, not the fact that the

-26-

sellers provided the buyers with test results, in finding there

had been no tort of fraud. 446 N.E.2d at 676-77.

Sun challenges the evidentiary basis for a second

element, that the party making the representation have knowledge

of its falsity. See Barret Assocs., Inc., 190 N.E.2d at 868. 

Clearly Laubinger knew of the 1974 spillage -- he had been on the

property during the clean-up, and was able to testify in some

detail about the event. It stretches credence to posit that he

would not have knowledge of the falsity of stating that it was a

good station when asked about past problems. There is no

evidence that Bunzell had actual knowledge. However, under

Massachusetts law, the party making a misrepresentation "need not

know that the statement is false if the fact represented is

susceptible of actual knowledge." VMark Software, Inc., 642 

N.E.2d at 593 n.9; see Snyder v. Sperry and Hutchinson Co., 333 

N.E.2d 421, 428 (Mass. 1975); Zimmerman v. Kent, 575 N.E.2d 70, 

74 (Mass. App. Ct. 1991). The district court found that while

inspecting the station Damon asked Bunzell about a depression in

the blacktop, and whether there had been any problems with the

underground storage tanks, to which Bunzell replied "No, we've

had no problems with it. It's all good." This is clearly a

misstatement of facts "susceptible of actual knowledge" --

indeed, Bunzell's name was listed on the "For Sale" sign at the

station: presumably, it would be his responsibility to be

informed about the history of the particular station he was

selling.

-27-

Relying on an Odometer Act case applying Georgia law,

see Huycke v. Greenway, 876 F.2d 94, 95 (11th Cir. 1989), Sun 

next argues that the Damons did not meet their burden of proving

intent to defraud. In fact, however, "Massachusetts law does not

. . . require an intent to deceive, let alone an intent to

deprive the plaintiff of money, to prove misrepresentation."

Bond Leather Co., 764 F.2d at 937 (citation omitted). 

"[A] long line of [Massachusetts] cases
[establishes] that 'the charge of
fraudulent intent, in an action for
deceit, may be maintained by proof of a
statement made as of the party's own
knowledge, which is false; provided the
thing stated is not merely a matter of
opinion, estimate or judgement, but is
susceptible of actual knowledge; and in
such a case it is not necessary to make
any further proof of an actual intent to
deceive.'"

Sperry, 333 N.E.2d at 428 (quoting Powell v. Rasmussen, 243 

N.E.2d 167, 168 (1969) (quoting Chatham Furnace Co. v. Moffat, 18 

N.E. 168, 169 (Mass. 1888))); see Roadmaster Indus., Inc. v. 

Columbia Mfg. Co., 893 F. Supp. 1162, 1176 (D. Mass. 1995); 

Zimmerman, 575 N.E.2d at 74.2 The Damons have met this burden 

of showing that the Sun representatives made a misrepresentation

of facts susceptible of actual knowledge, and so they have met

 

2 While the decision Bond Leather Co. v. Q.T. Shoe Mfg. Co. 
notes that, contrary to Sun's contention, an intent to deceive
need not be proven, it also reads Sperry as requiring an "intent 
that the plaintiff rely on the challenged false statements." 764
F.2d at 937. We have found no case law supporting that
contention. Nonetheless, we note that it is a reasonable
inference that the representations made by Sun's representatives
to a known potential buyer were made with the intent that the
Damons rely on the statements.

-28-

their burden as to intent.

Sun maintains that the district court failed to find

that Sun intended the plaintiffs to rely on the

misrepresentations.3 Federal Rule of Civil Procedure 52(a)

mandates that courts "find the facts specially and state

separately [their] conclusions of law thereon" when trying facts

without a jury. See, e.g., Monta ez v. Bagg, 510 N.E.2d 298, 300 

(Mass. App. Ct. 1987) (noting that judge did not make detailed

findings of fact regarding chapter 93A claims under Mass. R. Civ.

P. 52(a)). However, "the judge need only make brief, definite

pertinent findings and conclusions on the contested matters."

Makuc v. American Honda Motor Co., 835 F.2d 389, 394 (1st Cir. 

1987). Here, while it did not explicitly discuss intent, the

district court set out the elements of the tort of

misrepresentation, and found that Sun's representatives made the

statements, that they were not opinions, and that Laubinger at

least knew about the spill when he made his statement. In short,

although the district court did not spell out every pertinent

point, it is clear that it has provided us with more than mere

 

3 Sun contests that the district court's statement that "it
should have been clear from Damon's questions that he was
concerned about the past and future integrity of the entire
underground gas delivery system" (District Court Findings of Fact
and Conclusions of Law, at 7 n.1), implies that Sun did not in
fact know what Damon asked about, and so no intent is
demonstrated on this record. However, we refuse Sun's invitation
to read this implication into the district court's statement,
especially as, in its findings of fact, the district court
specifically found that Damon had asked each of the
representatives about past conditions, particularly regarding the
underground tanks. 

-29-

conclusions. 

C. Reasonable Reliance C. Reasonable Reliance 

Sun's final attack on the evidence centers on the

element of reasonable reliance. See Elias Bros. Restaurants v. 

Acorn Enters., 831 F. Supp. 920, 922 (D. Mass. 1993) (noting that 

the reliance element of the tort has been defined as requiring

that it be reasonable). First, it states that the district court

was silent on reasonable reliance. To the contrary, although it

did not address the reasonableness of the reliance, the district

court found that Damon "would not have purchased the station for

$90,000 if he had been aware of the 1974 spill." (District Court

Findings of Fact and Conclusions of Law, at 8). 

Sun points to the fact that the Damons had the right to

inspect the property prior to sale and did not do so as vitiating

any argument of reasonable reliance, especially given Damon's

acknowledged awareness of environmental issues. However, it is

well established under Massachusetts law that "failure to

investigate the veracity of statements does not, as a matter of

law, bar recovery for misrepresentation." Bond Leather Co., 764 

F.2d at 936. To find that the Damons' failure to investigate

effectively bars their claim, as Sun requests, would run counter

to the established case law on that point. "Only reliance on

'preposterous or palpably false' representations vitiates a

misrepresentation claim." Roadmaster Indus., Inc., 893 F. Supp. 

at 1179 (quoting Zimmerman, 575 N.E.2d at 76). Sun's 

representations cannot be so characterized.

-30-

Sun's reliance on Maloney v. Sargisson, 465 N.E.2d 296 

(Mass. App. Ct. 1984), is misplaced. There, the Maloneys bought

property, and subsequently discovered that because of a drain

line to a local reservoir, it could not be built on. Sargisson

was the attorney with whom they entered the purchase and sale

agreement. That agreement was made contingent on the land

passing a percolation test and deep hole test to qualify for a

building permit, with the tests to be done at the buyers'

expense. The tests were done, indicated positive results, and

the sale went through. Later, however, it turned out that the

tests were done at the wrong time of year, and the results of the

second deep hole test were adverse. The Maloneys sued Sargisson

alleging, among other things, misrepresentation. The Appeals

Court found that the Maloneys could not have relied on

Sargisson's statements that "he knew all there was to know about

the property," that they did not need to hire a lawyer, and that

"the lot was a good building lot": 

Whatever those alleged statements may be
taken to mean, the Maloneys would not
have relied upon them to their detriment
so far as they might have borne on the
capacity of the lot to pass soil tests .
. . . Concerning that aspect of the
land's character, their affidavit
discloses, the Maloneys made their own
examination.

Id. at 301. 

Clearly, Maloney is distinguishable from the present 

case. There, the buyer specified in the agreement that it would

make the tests, and did so. A district court had found that

-31-

there was no evidence Sargisson knew or should have known of the

existence of the problem, a finding which carried weight as prima

facie evidence in the superior court and was not questioned by

the Appeals Court. Id. at 300. There is no indication that 

Sargisson made a representation as to the status of the soil:

rather, it is clear that the Maloneys relied on their own tests.

Here, the questions went to the past history of the property, not

just the present condition. In short, the reasoning in Maloney 

is based on a sufficiently different set of facts such that Sun's

reliance on it fails.4 See Roadmaster Indus., Inc., 893 F. 

Supp. at 1179 (holding that plaintiff buyer's failure to

investigate contamination of soil at manufacturing plant as to

matters of public record did not vitiate its misrepresentation

claim).

D. Factual Conclusions D. Factual Conclusions 

Sun makes the additional argument that the district

court made factual findings, where the facts were controverted,

without explaining the reasoning for its determination.5 See 

 

4 Sun's reliance on Rhode Island Hosp. Trust Nat'l Bank v. 
Varadian, 647 N.E.2d 1174 (Mass. 1995), a promissory estoppel 
case, is similarly misplaced. There, the court found that since
the evidence did not warrant a finding that a promise in the
contractual sense was made, reliance by the experienced
businessmen plaintiffs would be unreasonable as a matter of law.
Id. at 1179. We fail to see how that case sheds any light on the 
misrepresentation charge here, where the court has found that a
misrepresentation was indeed made. 

5 Sun also contends that several of the district court's
findings were irreconcilable and contradictory. As we address
those allegations elsewhere in the opinion, we do not discuss
them here.

-32-

Fed. R. Civ. P. 52(a) (mandating that court "find the facts

specially and state separately its conclusions of law thereon"

when trying facts without a jury). "To satisfy the demands of

Rule 52(a), a trial court must do more than announce statements

of ultimate fact. The court must support its rulings by spelling

out the subordinate facts on which it relies." U.S. for the Use 

of Belcon, Inc. v. Sherman Constr. Co., 800 F.2d 1321, 1324 (4th 

Cir. 1986) (vacating decision and remanding where district court

made no finding on extent of plaintiff's responsibilities where

the conflict "turn[ed] upon [the parties'] respective duties").

Our examination of the findings Sun questions reveal no error by

the district court.6

First, Sun questions the credence the district court

placed in Damon's testimony. Specifically, it argues that it

should be provided with an explanation of why the court

"disregarded the uncontroverted testimony of Mr. Damon that the

station, the underground tanks, and the soil was '100% clean' in

1980 when Getty examined the station." (Appellant's Brief, at

40). Sun's phrasing twists the testimony: Damon testified that

Getty told him the soil was clean, not that he knew it to be

true. As we have already noted, Sun has not provided any

evidence that Getty was in fact testing the soil: the district

court specifically found that Getty was testing the tanks for
 

6 Two of Sun's contentions, that the district court's findings
are insufficient as to intent and reliance, and that it did not
adequately address the factual basis for Cataldo's exert opinion
on the property's condition, have been addressed elsewhere in the
opinion.

-33-

tightness. The district court stated during closing arguments

that it also did not consider that Damon had made an admission

that the property was clean. 

Sun also argues that the court had to explain why it

chose the "version" of his story Damon told at trial, instead of

what it deems "varying" earlier versions under oath, especially

as regards what questions he put to the Sun representatives. Our

review of the record does not indicate that Damon's testimony at

trial was so inconsistent with his earlier testimony as to

constitute "'unsupported self-serving testimony that flies in the

teeth of unimpeachable contradicting evidence and universal

experience.'" Venturelli, 850 F.2d at 833 (quoting Insurance Co. 

of North Am. v. Musa, 785 F.2d 370, 374-75 (1st Cir. 1986)). 

Indeed, the district court stated that it did not "look upon them

as being that different. There are differences, there's no

question, but the extent of the differences is a difficult

question, it strikes me." (Day 4, page 17). 

Lastly, Sun contends that the court did not provide an

evidentiary basis for its conclusion, made in a footnote, that

"it should have been clear" to Sun what Damon meant in his

questioning. The findings here, however, are not like the

inconsistent and contradictory findings in Lyles v. United 

States, 759 F.2d 941, 944 (1st Cir. 1985), cited by Sun. The 

court here specifically stated in its findings of fact that Damon

asked both Laubinger and Bunzell about past problems. In

connection with its comment that Sun's representatives should

-34-

have understood the scope of Damon's questions, the district

court cited his testimony that "the only thing you've got in a

gas station is tanks and pumps and the lines. I mean, what else

is there?" (District Court Findings of Fact and Conclusions of

Law, at 7 n.1). A "judge need only make brief, definite

pertinent findings and conclusions on the contested matters."

Makuc v. American Honda Motor Co., 835 F.2d 389, 394 (1st Cir. 

1987). The district court met its burden here. 

CALCULATION OF DAMAGES CALCULATION OF DAMAGES

The district court calculated the damages for the tort

claim as $245,000, the difference between the actual value of the

Damon's property if it was uncontaminated -- $600,000 -- as the

defendant's representatives stated and the actual value of the

property as contaminated -- $325,000 -- as measured when the

plaintiffs sold the property to Rooney in 1992.7 Sun does not

contest the district court's basic measurement, but argues that

it should have set off specific monies against the purchase

price, and should have accounted for the Damons' obligation to

mitigate damages. We disagree, for the following reasons. 

First, Sun contends the value of the indemnity Rooney

gave the Damons from and against all environmental liability,

which it suggests is approximately $104,000, should have been set
 

7 Adopting the sale price suggested by Rooney's gasoline
supplier, the district court found the fair market value of the
property if it had been not been contaminated to be $600,000. It
took the actual sale price as the measure of the value of the
property as contaminated: Rooney assumed the $325,000 of the
Damons' first and second mortgages, $10,000 in arrears, and made
a $20,000 cash payment, for a total of $355,000.

-35-

off against the purchase price. However, as the Damons point

out, if Sun had not made the misrepresentation, the Damons would

not be responsible to clean up the mess. Had the Damons cleaned

up the property themselves, they would be entitled to

reimbursement, and, presumably, the sale price of the property

would have been higher: reducing the damages by the value of the

indemnity would virtually reverse this process. Second, Sun

argues that $40,000 should be taken off the damage figure, as the

Damons did not give Rooney $40,000, as they were required to per

their agreement, to defray costs of contamination. Again, if

Sun's representatives had not misrepresented the property's

condition, the Damons would not have owed that money to Rooney;

if they had paid it to Rooney, it would have been added to, not

offset against, the damages (and presumably would be reflected in

the actual sale price). Third, Sun argues that $29,000 in back

rent from Rooney should have been offset as well, since the

Damons did not seek it from him. However, once again, the

plaintiffs would not have lost that money without the

misrepresentation. Also, according to paragraph 9 of the

Agreement and Lease, Rooney was entitled to opt out of his lease

if a governmental authority prevented him from occupying or using

the property as a gasoline station. Thus, it is unclear that

Rooney did, in fact, owe the past rent.

Sun also argues that the Damons failed to mitigate

their losses by not seeking back rent from Rooney. In light of

the terms of the Agreement and Lease between Rooney and the

-36-

Damons, the fact that the Damons were obligated to pay Rooney

$40,000, which they did not, and the subsequent sale of the

property, we are hard put to accept their reasoning.

For the above reasons, the district court's

determination of damages is affirmed.

CHAPTER 93A CLAIMS CHAPTER 93A CLAIMS

The district court found that Sun's actions were

"unfair or deceptive" and thus violated Massachusetts General

Laws chapter 93A, section 11. At the same time, the lower court

refused to award multiple damages under section 11, on the basis

that "the evidence of bad faith or willful intent to deceive

[was] insufficient to merit a punitive award." (District Court

Findings of Fact and Conclusions of Law, at 12). See Mass. Gen. 

L. ch. 93A, 11 (allowing multiple damages if "the use or

employment of the . . . act or practice was . . . willful or

knowing"). Sun argues on appeal that the court erred in finding

it violated chapter 93A, while the Damons contend that the court

erred in refusing multiple damages. For the reasons discussed

below, we affirm the district court's finding that Sun was liable

under chapter 93A, as well as its refusal of multiple damages.

A. Sun's Liability Under Chapter 93A A. Sun's Liability Under Chapter 93A 

1. Standard of Review 1. Standard of Review 

We begin our analysis by reciting our standard of

review. The district court's findings of law face de novo 

review, and its findings of fact engender clear error review.

See Industrial Gen. Corp. v. Sequoia Pacific Sys. Corp., 44 F.3d 

-37-

40, 43 (1st Cir. 1995). We deem a finding of fact to be clearly

erroneous "'when although there is evidence to support it, the

reviewing court on the entire evidence is left with the definite

and firm conviction that a mistake has been committed.'" Id. at 

43 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 

(1985) (citation omitted)). 

-38-

2. The Legal Framework 2. The Legal Framework 

The district court found that Sun's actions were

"unfair or deceptive" within the scope of chapter 93A. Section

11 provides a cause of action to 

[a]ny person who engages in the conduct
of any trade or commerce and who suffers
any loss of money or property, real or
personal, as a result of the use or
employment of another person who engages
in any trade or commerce of . . . an
unfair or deceptive act or practice
. . . .

Mass. Gen. L. ch. 93A, 11; see Mass. Gen. L. ch. 93A, 2 

(establishing that "unfair or deceptive acts or practices in the

conduct of any trade or commerce" are unlawful). Common law

misrepresentation claims provide a basis for liability under

section 11. See, e.g., Sheehy v. Lipton Indus., Inc., 507 N.E.2d 

781, 785 (Mass. App. Ct. 1987). 

Section 11 does not define what conduct rises to the

level of an "unfair or deceptive" act. See Cambridge Plating 

Co., slip op. at 38-39. In weighing whether a defendant's 

conduct meets the statute's requirements, "a common refrain has

developed. 'The objectionable conduct must attain a level of

rascality that would raise an eyebrow of someone inured to the

rough and tumble of the world of commerce.'"8 Quaker State Oil 
 

8 The Damons argue that in Massachusetts Employers Ins. Exch. v. 
Propac-Mass, Inc., 648 N.E.2d 435 (Mass. 1995), the SJC abandoned 
the "rascality test" in stating that it "view[s] as uninstructive
phrases such as 'level of rascality' and 'rancid flavor of
unfairness'." Id. at 438. Contrary to the Damons' 
interpretation, the SJC was simply recognizing that the mentioned
phrases do not, despite their frequent citation, lend much
guidance in the fact-specific context of a chapter 93A claim.

-39-

Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 

1989) (quoting Levings v. Forbes & Wallace Inc., 396 N.E.2d 149, 

153 (Mass. App. Ct. 1979)). In other words, 

a chapter 93A claimant must show that the
defendant's actions fell "within at least
the penumbra of some common-law,
statutory, or other established concept
of unfairness," or were "immoral,
unethical, oppressive or unscrupulous"
. . . .

Id. (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 

915, 917 (Mass. 1975)); see Tagliente v. Himmer, 949 F.2d 1, 7 

(1st Cir. 1991). As the SJC recently stated, in weighing an

act's fairness, the focus is "on the nature of the challenged

conduct and on the purpose and effect of that conduct as the

crucial factors." Massachusetts Employers Ins. Exch., 648 N.E.2d 

at 438.

3. Sun's Violation of Chapter 93A 3. Sun's Violation of Chapter 93A 

In its challenge to the district court's finding that

Sun is liable under section 11, Sun maintains that its conduct

was not "unfair or deceptive." However, its argument on that

basis is conclusory at best: Sun points to neither evidence in

the record nor case law which would cast into doubt the district

court's factual determination on that point.9 As neither Sun
 

See Cambridge Plating Co., slip op. at 39.  

9 Sun does cite to evidence that Damon was a businessmen who had
sold gasoline and used underground storage tanks for some thirty
years prior to buying the property, but only to maintain that the
court must apply a "heightened standard of an unfair or deceptive
act or practice." We remind Sun that "[s]ophistication of the
parties is not mentioned in chapter 93A and the amendment of
chapter 93A to cover business entities did not limit the

-40-

nor our review of the record provides us with grounds to find the

district court erred, we affirm the lower court's application of

section 11. See Schwanbeck v. Federal-Mogul Corp., 578 N.E.2d 

789, 803 (Mass. 1991) (noting that "whether a particular set of

acts, in their factual setting, is unfair or deceptive is a

question of fact"), rev'd on other grounds, 592 N.E.2d 1289 

(Mass. 1992).

Sun does look to Winter Panel Corp. v. Reichhold 

Chems., Inc., 823 F. Supp. 963 (D. Mass 1993), for support. 

There, plaintiff alleged that the defendant chemical supplier

made false statements about its ability to supply the plaintiff

with chemicals. Sun acknowledges that the Winter Panel court 

noted that "[k]nowing non-disclosure of information necessary to

make affirmative statements complete or non-misleading will give

rise to an action for misrepresentation, including an action

under chapter 93A." Id. at 975. Sun nonetheless seeks to save 

itself from liability by reliance on the court's additional

statement that "[s]imply neglecting to discuss [defendant's

representatives'] lack of practical experience with the precise

methods of production pursued by Winter Panel, however, does not

at present seem to be the kind of knowing omission that achieves

 

statute's protection to small, unsophisticated businesses."
V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 418 (1st Cir. 
1985). Regardless of the level of the parties' sophistication,
we apply the well-developed standard for section 11 actions
between two persons engaged in business. Of course, their
relative levels of sophistication may enter into the fact-based
analysis the court carries out in weighing whether a party's act
was unfair or deceptive.

-41-

the level of rascality necessary to find a violation of chapter

93A." Id. As we have already affirmed the district court's 

finding of misrepresentation, it is manifest that Sun's acts sink

below the level of "simply neglecting to discuss" the 1974

contamination. Winter Panel offers Sun no relief. 

Sun's primary argument against the district court's

holding blurs the line between section 11 liability and multiple

damages.10 Specifically, it contends that since the district

court apparently found Sun's conduct was not willful and knowing,

Sun cannot have engaged in common law fraud. Since it could not

have engaged in fraud, it concludes, its conduct did not rise to

the level of intentional misconduct, beyond mere negligence or

inadvertence, that section 11 demands. 

We disagree. As noted above, the district court

refused to award multiple damages here on the basis that 

[m]ultiple damages are not mandated when
misrepresentation occurs. Only "callous
and intentional violations" deserve
multiple damages treatment. In this
instance, we believe the evidence of bad
faith or willful intent to deceive is
insufficient to merit a punitive award of
multiple damages.

 

10 Sun also makes the circular argument that if its conduct
amounts to negligence, it has not met the requirement of
rascality needed for section 11, since negligence cannot be the
basis for a section 11 violation. To the contrary, negligence
can provide the basis for chapter 93A liability, so long as it is
paired with an unfair or deceptive act or practice -- in other
words, negligence plus rascality equals liability. See Squeri, 
588 N.E.2d at 24; Glickman v. Brown, 486 N.E.2d 737, 741 (Mass. 
App. Ct. 1985); see, e.g., Briggs v. Carol Cars, Inc., 553 N.E.2d 
930 (Mass. 1990) (upholding application of sections 2 & 9 of
chapter 93A where defendant made reckless misrepresentation). 

-42-

(District Court Findings of Fact and Conclusions of Law, at 12

(citations omitted)). As Sun itself indicates, reading the

district court opinion as finding that Sun was not at all knowing

or willful is inconsistent with the first element of the tort of

misrepresentation, i.e. that a party make a false representation

with the knowledge of its falsity. See Barret Assocs., Inc., 190 

N.E.2d at 868. We understand the district court opinion as

indicating that there was evidence of bad faith and willful

intent to deceive, but that some quantum of knowing or willful

violation must be met before a party is entitled to punitive

damages under chapter 93A. Indeed, "shades of culpability are

supposed to matter in applying the punitive damages provision in

the statute." Cambridge Plating Co., slip op. at 42. Our 

reading is consistent with the district court's specific finding

that when Damon asked Laubinger if Sun had experienced any

problems with the station and underground tanks, Laubinger

replied that it was a "good station," despite his knowledge of

the 1974 contamination. Cf. VMark Software, 642 N.E.2d at 596 

n.15 ("We put great stock in the findings of the trial judge on

issues such as intent and motivation, since he was in a superior

position to assess the weight and credibility of the witnesses,

and there is no showing that his findings were clearly

erroneous.").

The case law supports this reading. In VMark Software, 

Inc. v. EMC Corp., cited by the district court, the trial court 

found VMark guilty of misrepresentation, but did not grant EMC

-43-

multiple damages under section 11. EMC claimed that the scienter

requirement for the tort of misrepresentation automatically

triggered section 11's mandatory doubling of damages for a

knowing violation of chapter 93A. The court disagreed, finding

that although VMArk's misstatements were made with sufficient

awareness of the facts for it to be liable under the traditional

tort formula, "they were not made so 'knowingly' as to warrant

the punitive sanctions of double damages under c. 93A." Id. at 

595. We recently reaffirmed that "[l]iability under Chapter 93A

for conduct amounting to intentional misrepresentation does not

automatically trigger punitive damages. There must be something

more." Cambridge Plating Co., slip op. at 42. Accordingly, the 

district court's conclusion that Sun's actions were not knowing

and willful enough to require punitive damages is not

inconsistent with intentional misrepresentation.

4. Multiple Damages Under Chapter 93A 4. Multiple Damages Under Chapter 93A 

Paragraph 5 of section 11 provides for multiple damages

where "the court finds that the use or employment of the . . .

act or practice was a willful or knowing violation." The Damons

argue that they should have been granted multiple damages, but do

not contend that the district court should have found Sun's

violation sufficiently willful or knowing to require double

damages.11 Instead, they base their position on the premise
 

11 In their statement of conclusions, the Damons do posit that
we should conclude that the district court's indication that Sun
was guilty of some level of bad faith or willful intent to
deceive suffices to require multiple damages under section 11,
para. 5. However, as they offer no support for this contention,

-44-

that we should essentially read into section 11 the provision of

section 9 which awards multiple damages for a defendant's bad

faith refusal to make a reasonable settlement offer after

demand.12 Their argument relies on the fact that sections 9

 

we deem it waived. See United States v. Zannino, 895 F.2d 1, 17 
(1st Cir.) ("[W]e see no reason to abandon the settled appellate
rule that issues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are
deemed waived."), cert. denied, 494 U.S. 1082 (1990). 

12 That section provides, in pertinent part:

Any person receiving . . . a demand for
relief who . . . makes a written tender
of settlement which is rejected by the
claimant may, in any subsequent action,
file the written tender and an affidavit
concerning its rejection and thereby
limit any recovery to the relief tendered
if the court finds that the relief
tendered was reasonable in relation to
the injury actually suffered by the
petitioner. In all other cases, if the
court finds for the petitioner, recovery
shall be . . . up to three but not less
than two times [actual damages] if the
court finds that . . . the refusal to
grant relief upon demand was made in bad
faith with knowledge or reason to know
that the act or practice complained of
violated said section two. 

Mass. Gen. L. ch. 93A, 9(3). By comparison, section 11 states,
in pertinent part:

The respondent may tender with his answer
. . . a written offer of settlement for
single damages. If such tender or
settlement is rejected by the petitioner,
and if the court finds that the relief
tendered was reasonable in relation to
the injury actually suffered by the
petitioner, then the court shall not
award more than single damages.

Mass. Gen. L. ch. 93A, 11.

-45-

and 11 share the goal of promoting reasonable settlement offers.

See International Fidelity Ins. Co. v. Wilson, 443 N.E.2d 1308, 

1318 (Mass. 1983). According to this logic, to further the

statute's goals we should punish defendants who are liable under

section 11 and who do not offer single damages with their Answer

by inflicting multiple damages on them, and reward those who do

with single damages. 

We have previously noted that "[i]t is unclear whether

section 11 permits recovery of multiple damages under such a

theory where bad faith is proved." Southworth Mach. v. F/V Corey 

Pride, 994 F.2d 37, 40 (1st Cir. 1993). Nonetheless, we do not 

hesitate in refusing the Damons' argument. First, we note that

section 9 is by its terms inapplicable to transactions between

persons engaged in business, and section 11 quite simply does not

include language acting as a counterpart to section 9's

requirement of multiple damages where a party does not make a

written tender of settlement. See id. Second, we note that, 

although it shares specific goals with section 9, "[s]ection 11

provides a different procedure for achieving the same objectives

of facilitating settlement and fixing damages." Nader v. Citron, 

360 N.E.2d 870, 874 (Mass. 1977). Indeed, the Massachusetts and

federal courts have consistently respected the differences in

procedures between the two sections. See, e.g., Fickes v. Sun 

Expert, Inc., 762 F. Supp. 998, 1001 (D. Mass. 1991); Aetna 

Casualty and Surety Co. v. State Park Ins. Agency, Inc., 428 

N.E.2d 376, 377 (Mass. App. Ct. 1981); see also Glickman, 486 

-46-

N.E.2d at 742 & n.7 (refusing to analyze section 11 damages in

terms of defendants' response to plaintiffs' demand letter).

"Whatever the merits of implying the demand letter scheme of 9

into 11, as urged by defendants, we find no support for such

implication in the language and structure of 11." Nader, 360 

N.E.2d at 874. Finally, we note that the district court did not

find that Sun's failure to tender an offer of settlement was

"made in bad faith with knowledge or reason to know that the act

or practice complained of violated said section 2," as section 9

demands, and the Damons have not demonstrated any evidence to the

contrary. Thus, even if we were to weigh Sun's failure to tender

an offer into our analysis, the Damons' challenge to the court's

damage award would fail.

Our decision today does not clash with the SJC's

decision in International Fidelity Ins. Co., despite the Damons' 

reliance on it. There, the SJC weighed the goal of promoting

reasonable settlements in both sections 9 and 11, and found that

it would be appropriate to impose independent liability against

the multiple defendants in that case, as to do so would promote

settlements. 443 N.E.2d at 1318. At the same time, however, the

Court noted that "the procedures set out in the two sections

differ," despite their common goal. Id. (citing Nader, 360 

N.E.2d at 870). Thus, we read International Fidelity Ins. Co. 

not as suggesting we read the damage provisions of section 9 into

section 11, but as recognizing that their goals are similar while

their methods are not. See Levings v. Forbes & Wallace, Inc., 

-47-

396 N.E.2d 149, 153 (Mass. App. Ct. 1979) ("The remedies and

procedures in 9 and 11 are related, but not parallel, and the

conditions of one section should not be read by implication into

the other."); Nader, 360 N.E.2d at 874 (noting that "analogies, 

whatever their utility, do not form a basis for the judicial

rewriting of statutes" in refusing to read section 9's demand

letter procedure into section 11).

ATTORNEY'S FEES ATTORNEY'S FEES

The district court awarded the Damons $40,620.40 in

attorney's fees and costs. See Mass. Gen. L. ch. 93A, 11 para. 

6 (mandating reasonable attorney's fees and costs be awarded

where the court finds a violation of 2). Sun argues that the

award was not reasonable, on the basis that the hourly rates

granted (specifically, the rate of $235 an hour for court

appearances and depositions) were exorbitant and unreasonable,

and the contingency nature of the engagement. Based on our

review of the record, we do not find the court's award

unreasonable.

CONCLUSION CONCLUSION

For the reasons discussed above, we find that the

district court's refusal of Sun's motion for entry or judgment

and motions to alter and amend the judgment and findings and for

a new trial were not an abuse of its discretion. Having

considered all the parties' arguments, we find both appeals to be

lacking in merit. Consequently, we affirm the decision of the 

district court on all points. 

-48-

No costs on appeal to either party.

-49-